[886 NE2d 162, 856 NYS2d 540]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v AZIM HALL, Appellant.

Argued February 7, 2008; decided March 25, 2008

## POINTS OF COUNSEL

*Center for Appellate Litigation,* New York City (*Barbara Zolot* and *Robert S. Dean* of counsel), for appellant. I. The drugs recovered from appellant following his arrest must be suppressed because there were no exigent circumstances justifying the warrantless body cavity search incident to arrest that the police conducted at the precinct solely for the purpose of finding evidence. (*Katz v United States,* 389 US 347; *People v Diaz,* 81 NY2d 106; *United States v Robinson,* 414 US 218; *Schmerber v California,* 384 US 757; *Chimel v California,* 395 US 752; *United States v Edwards,* 415 US 800; *People v More,* 283 AD2d 715; *Blackburn v Snow,* 771 F2d 556; *Fuller v M.G. Jewelry,* 950 F2d 1437; *Bell v Wolfish,* 441 US 520.) II. The initial "strip search" was itself unconstitutional. (*People v De Bour,* 40 NY2d 210; *Illinois v Lafayette,* 462 US 640; *Weber v Dell,* 804 F2d 796, *cert denied sub nom. County of Monroe v Weber,* 483 US 1020; *Sarnicola v County of Westchester,* 229 F Supp 2d 259; *Swain v Spinney,* 117 F3d 1; *People v Barnville,* 31 AD3d 271; *People v Kelley,* 306 AD2d 699; *United States v Montoya de Hernandez,* 473 US 531; *People v P.J. Video,* 68 NY2d 296; *People v Scott,* 79 NY2d 474.)

*Robert M. Morgenthau, District Attorney,* New York City (*Eric Rosen* and *Vincent Rivellese* of counsel), for respondent. The

strip and visual body cavity search of defendant at the police station house subsequent to his lawful arrest for the felony sale of narcotics was entirely reasonable. (*Schmerber v California,* 384 US 757; *People v More,* 97 NY2d 209; *Bell v Wolfish,* 441 US 520; *United States v Robinson,* 414 US 218; *United States v Edwards,* 415 US 800; *Chimel v California,* 395 US 752; *Knowles v Iowa,* 525 US 113; *Illinois v Lafayette,* 462 US 640; *Swain v Spinney,* 117 F3d 1; *Chapman v Nichols,* 989 F2d 393.)

**OPINION OF THE COURT**

GRAFFEO, J.

In this case, we must consider whether it is constitutionally permissible for police to subject a person arrested for a drug sale to a visual body inspection followed by a body cavity search without first obtaining a warrant. We conclude that a visual body inspection may be conducted if the police have a factual basis supporting a reasonable suspicion that the arrestee has evidence concealed inside a body cavity and the search is conducted in a reasonable manner. If the visual inspection reveals the presence of a suspicious object, the police must obtain a warrant authorizing the object's removal unless there are exigent circumstances.[1]

I

During the evening of February 10, 2005, a team of police officers conducted a narcotics interdiction operation in Manhattan. Sergeant Burnes, a 20-year police veteran with extensive drug arrest experience, was stationed on the roof of a building observing individuals on the street below through binoculars. Burnes saw a man named Meyers that he recognized from the neighborhood standing outside a bodega. Two individuals approached Meyers, spoke with him and handed him money. Meyers then walked over to defendant, conversed briefly with him and gave him the cash.

Defendant went into the bodega while Meyers stood near the front door. After being inside the store for about three minutes, defendant reappeared and handed something to Meyers. Meyers

---

**1.** Five members of this Court (Chief Judge Kaye, Judges Read, Smith, Pigott and myself) agree that the reasonable suspicion standard applies to visual body cavity inspections. Four members (Chief Judge Kaye, Judges Ciparick, Jones and myself) conclude that an object protruding from a body cavity cannot be removed without a warrant unless there are exigent circumstances. Judges Ciparick and Jones disagree with the majority on the first issue; Judges Read, Smith and Pigott disagree with the majority on the second issue.

approached the individuals who had given him the money and held out his hand to them. Sergeant Burnes observed two small, white objects in Meyers' hand that appeared to be crack cocaine. Each of the men took one piece and departed. A short time later, defendant and Meyers walked away from the bodega, heading in different directions. Burnes then contacted officer Spiegel on the street using radio communication and eventually defendant and Meyers were taken into police custody.

Defendant was transported to a police station where Spiegel searched his clothing but no drugs were found. Spiegel placed defendant in a private detention cell and asked him to remove his clothing. Burnes entered the cell and defendant was ordered to bend over or squat, at which point Spiegel and Burnes observed a string or piece of plastic hanging out of defendant's rectum. Believing that the string was attached to a package of drugs hidden inside defendant's body, Burnes ordered defendant to remove the object. When defendant refused, Spiegel proceeded to hold defendant while Burnes pulled on the string and removed a plastic bag that was found to contain crack cocaine.

Defendant was indicted for criminal possession of a controlled substance in the third and fifth degrees. Prior to trial, he moved to suppress the drugs taken from his body, claiming that the police were required to obtain a warrant before examining his body cavity. Supreme Court granted the motion and dismissed the indictment. The Appellate Division reversed, concluding that the visual inspection of defendant's body cavity was permissible because the police had reasonable suspicion to believe that defendant had narcotics hidden inside his body and that, once the string was discovered, the police were allowed to immediately retrieve the drugs without first obtaining a warrant. A Judge of this Court granted leave.

## II

There are three distinct and increasingly intrusive types of bodily examinations undertaken by law enforcement after certain arrests and it is critical to differentiate between these categories of searches. A "strip search" requires the arrestee to disrobe so that a police officer can visually inspect the person's body. The second type of examination—a "visual body cavity inspection"—occurs when a police officer looks at the arrestee's anal or genital cavities, usually by asking the arrestee to bend over; however, the officer does not touch the arrestee's body cavity. In contrast, a "manual body cavity search" includes

some degree of touching or probing of a body cavity that causes a physical intrusion beyond the body's surface.[2]

The preeminent decision examining the constitutional dimensions of searches that involve police intrusion into a person's body is *Schmerber v California* (384 US 757 [1966]). In that case, a police officer had a physician at a hospital draw a blood sample to determine the level of alcohol that was in the blood of an individual arrested after a motor vehicle accident. Recognizing that "interests in human dignity and privacy" arise whenever the police need to enter a person's body to secure evidence, the United States Supreme Court concluded that a lawful arrest alone does not justify police intrusion into a person's body (*id.* at 769-770). Rather, there must be "a clear indication that . . . [relevant] evidence will be found" inside an arrestee's body and a search warrant authorizing the seizure of evidence must be obtained unless an emergency situation exists (*id.* at 770).[3] In *Schmerber*, the Supreme Court determined that the blood evidence was legally obtained and admissible because the extraction was performed in a reasonable manner under exigent circumstances.[4]

Although *Schmerber* did not address the constitutionality of less intrusive visual inspections of an arrestee's body, post-*Schmerber* precedent demonstrates considerable judicial consensus concluding that visual body inspections are constitutionally distinct from searches that require the police to intrude beyond the surface of a person's body and that the two types of searches are therefore subject to different legal standards. In *Bell v Wolfish* (441 US 520 [1979]), the United States Supreme Court upheld the blanket policy of a pretrial detention center

---

**2.** *See e.g. Paulino v State*, 399 Md 341, 352, 924 A2d 308, 315 (2007), *cert denied* 552 US —, 128 S Ct 709 (2007); *Blackburn v Snow*, 771 F2d 556, 561 n 3 (1st Cir 1985); *McGee v State*, 105 SW3d 609, 615 (Tex Ct Crim App 2003); Kamins, New York Search and Seizure § 4.03 (5), at 4-141 (2007).

**3.** "Clear indication" means "the necessity for particularized suspicion that the evidence sought might be found within the body of the individual"; it is not "a third Fourth Amendment threshold between 'reasonable suspicion' and 'probable cause'" (*United States v Montoya de Hernandez*, 473 US 531, 540 [1985]). Because *Schmerber* mandates a warrant in the absence of exigent circumstances, the clear indication test requires that searches beyond the surface of a person's body be supported by at least probable cause.

**4.** The Court concluded that an emergency existed because the percentage of alcohol in the blood begins to diminish shortly after the person stops drinking, which meant that the time expended to secure a warrant would have caused relevant evidence to degrade or disappear (*see Schmerber*, 384 US at 770-771).

that conducted visual body cavity examinations of detainees following visitations with persons from outside the facility. In assessing the legality of this practice under the Fourth Amendment, the Supreme Court explained that various factors should be considered, including "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted" (*id.* at 559). Weighing these interests, along with the fact that the smuggling of contraband was a frequent problem posing significant security concerns for detention centers, the Court held that such visual cavity searches of pretrial detainees could be conducted on less than probable cause grounds so long as they were conducted in a reasonable manner (*id.* at 559-560).

The Supreme Court has yet to address the question of whether warrantless strip searches of persons arrested—as opposed to pretrial detainees—can be performed in a manner that satisfies constitutional requirements (*see Illinois v Lafayette*, 462 US 640, 646 n 2 [1983]). Nevertheless, it is clear that reasonableness is the "ultimate touchstone of the Fourth Amendment" (*Brigham City, Utah v Stuart*, 547 US 398, 403 [2006]; *see Wolfish*, 441 US at 558 [the "Fourth Amendment prohibits only unreasonable searches"]). Our task, then, is to determine whether it is reasonable to draw a constitutional distinction between a visual inspection of an arrestee's body (which requires no touching of the person's body whatsoever) and a manual body cavity search (which necessarily results in an intrusion beyond the body's surface and possibly the removal of an object or the insertion of an instrument into an orifice).

The majority of appellate courts to consider the propriety of visual inspections have applied the reasoning of *Wolfish* and recognized that the difference in the degree of intrusiveness between visual and manual body cavity searches provides ample justification for applying a standard less stringent than *Schmerber* to visual cavity inspections of arrestees. Thus, it has been held that a visual body cavity search of an arrestee may be justified by a reasonable suspicion that the arrestee is concealing a weapon or contraband (*see Swain v Spinney*, 117 F3d 1, 5 [1st Cir 1997]), which could be supported by consideration of "the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest" (*Weber v Dell*, 804 F2d 796, 802 [2d Cir 1986], *cert denied sub nom. County of Monroe v Weber*, 483 US 1020 [1987]; *see e.g. Campbell v Miller*, 499 F3d 711, 718 [7th Cir 2007]; *Stewart v Lubbock County, Tex.*, 767

F2d 153, 156-157 [5th Cir 1985], *cert denied* 475 US 1066 [1986]; *Mary Beth G. v City of Chicago*, 723 F2d 1263, 1273 [7th Cir 1983]; *Sarnicola v County of Westchester*, 229 F Supp 2d 259, 269-271 [SD NY 2002]; *see also Blackburn v Snow*, 771 F2d at 562; *but see Fuller v M.G. Jewelry*, 950 F2d 1437, 1448-1449 [9th Cir 1991]).

■ These decisions stand for the principle that the Fourth Amendment does not prohibit a visual cavity inspection if the police have at least a reasonable suspicion to believe that contraband, evidence or a weapon is hidden inside the arrestee's body. As the balancing test in *Wolfish* suggests, the "reasonable suspicion" standard must take into account the nature of the crime charged, the circumstances of the arrest and the scope of the particular intrusion. Unlike manual body cavity searches, strip searches and visual cavity inspections do not create a risk of physical pain or injury to arrestees. Because a manual cavity search is more intrusive and gives rise to heightened privacy and health concerns, when weighed against the legitimate needs of law enforcement, we believe it should be subject to a stricter legal standard.

The concurrence maintains that *Wolfish* is not particularly relevant to the assessment of whether reasonable suspicion should govern visual cavity inspections because it focused on the need to maintain institutional security (*see* concurring op at 316-317). It is true that *Wolfish* addressed security concerns that are not present in this case. But this alone does not render the rationale and analytical framework of *Wolfish* irrelevant. *Wolfish* recognized that there is a legitimate interest in preventing drugs from being distributed in a secure law enforcement facility (*see Wolfish*, 441 US at 559)—which a police station surely is—and the Supreme Court has repeatedly reiterated that there is nothing unreasonable about allowing the police to conduct a search of an arrestee incident to an arrest for the purpose of preserving evidence (*see e.g. Knowles v Iowa*, 525 US 113, 116 [1998]; *United States v Robinson*, 414 US 218, 234-235 [1973]).[5]

---

5. The concurrence further reasons that visual body inspections are unnecessary because precincts contain numerous detention and holding cells that can be used to segregate and monitor arrestees pending the issuance of warrants (*see* concurring op at 317). This is simply not the case throughout our state. In rural locales, there may be a limited number of State Troopers, deputy sheriffs or municipal police officers on duty covering expansive geographical regions—and some towns and villages do not maintain their own police forces. This presents a practical difficulty in keeping an arrestee suspected of

*Schmerber*, however, dictates that a more stringent standard be applied to a physical search of an arrestee's body cavity. Our most recent decision addressing a search into a person's body is *People v More* (97 NY2d 209 [2002]). In that case, the police entered a residence and found the defendant sitting near drugs and drug paraphernalia. They took him into a room in the apartment, had him remove his clothing and made him bend at the waist to check whether he had drugs hidden between his buttocks. When the police saw a plastic bag protruding from the defendant's rectum, they forcibly removed it.[6]

We recognized that a search of this nature was "at least as intrusive as [the] blood test procedures" in *Schmerber* (*id.* at 213). As a result, the actions of the police were constitutionally permissible only if the People could satisfy the clear indication and exigent circumstance requirements of *Schmerber*. We determined that the record before us was "devoid of any evidence from which an officer 'might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant' posed a threat to the officer's personal safety or of the destruction of the evidence" (*id.* at 214, quoting *Schmerber*, 384 US at 770). Because there were no exigent circumstances supporting the warrantless intrusion into the suspect's body, we held that the removal of the object from the defendant's rectum without prior judicial authorization violated the Fourth Amendment (*see More*, 97 NY2d at 214).[7]

■ Summarizing the relevant constitutional precedent, it is clear that a strip search must be founded on a reasonable

---

having drugs hidden in his body segregated from other arrestees and under constant surveillance. We should not adopt a rule that conditions the constitutionality of a visual inspection on the relative availability of law enforcement resources.

**6.** The lurid facts described by the defendant in his brief in *More*, and quoted at length in the dissent (*see* dissenting op at 323-324), are simply not those found by the suppression court, affirmed by the Appellate Division and relied on by this Court in its decision. In that case, as this Court noted, an outer portion of the plastic bag containing cocaine was protruding from the defendant's rectum, yet the description illustrates the perils of attempting to remove even a protruding article from an arrestee's body cavity.

**7.** Although we declined in *More* to discuss the validity of body cavity searches conducted at a police station (*see* 97 NY2d at 214 n), it is evident that the location of a search is not the determinative factor under *Schmerber* because that decision prohibits all warrantless intrusions into an arrestee's body if there is no probable cause and exigent circumstances established, regardless of where the search occurs. Aside from those considerations, the site of a search is relevant only to the reasonableness of the manner in which the search was conducted (i.e., how, where and by whom it was done).

suspicion that the arrestee is concealing evidence underneath clothing and the search must be conducted in a reasonable manner. To advance to the next level required for a visual cavity inspection, the police must have a specific, articulable factual basis supporting a reasonable suspicion to believe the arrestee secreted evidence inside a body cavity and the visual inspection must be conducted reasonably. If an object is visually detected or other information provides probable cause that an object is hidden inside the arrestee's body, *Schmerber* dictates that a warrant be obtained before conducting a body cavity search unless an emergency situation exists. Under our decision in *More*, the removal of an object protruding from a body cavity, regardless of whether any insertion into the body cavity is necessary, is subject to the *Schmerber* rule and cannot be accomplished without a warrant unless exigent circumstances reasonably prevent the police from seeking prior judicial authorization.

It is important to emphasize that visual cavity inspections and manual body cavity searches cannot be routinely undertaken as incident to all drug arrests or permitted under a police department's blanket policy that subjects persons suspected of certain crimes to these procedures. There must be particular, individualized facts known to the police that justify subjecting an arrestee to these procedures (*see generally People v McIntosh*, 96 NY2d 521, 525 [2001]). Our precedent on this point is unequivocal: the police are required to have "specific and articulable facts which, along with any logical deductions, reasonably prompted th[e] intrusion" (*People v Cantor*, 36 NY2d 106, 113 [1975]), although they are allowed to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person" (*United States v Arvizu*, 534 US 266, 273 [2002] [internal quotation marks omitted]). In addition, the reasonableness of the manner in which the search is conducted should be evaluated by reference to where, how and by whom the inspection occurred (e.g., usually in a private location,[8] by a person of the same gender and without causing the arrestee to suffer further undue humiliation).

---

8. We acknowledge that a search other than in a private location is patently unreasonable except in the most extraordinary circumstances (perhaps where necessary to save the life of an arrestee). Thus, in the absence of highly unusual facts, we—like other courts across the nation—would condemn public visual cavity inspections as abusive, shameful and unconstitutional (*see e.g. Campbell v Miller*, 499 F3d at 719).

## III

Applying the reasonable suspicion standard to the facts of this case, the record supports the conclusion of the Appellate Division that the strip search and visual cavity inspection of defendant's body were constitutionally valid because the particular facts, viewed objectively and in their totality, provided the police with reasonable suspicion that defendant had drugs secreted underneath his clothing and possibly in his body. Defendant had been observed engaging in a hand-to-hand sale of two small quantities of crack cocaine (*see Campbell v Miller*, 499 F3d at 718 [the police may consider the nature of the crime the defendant committed]). The police saw that, in order to complete the sale, defendant retreated into a building where he lingered for up to three minutes, which suggested that the narcotics defendant then produced outside the bodega were concealed in a place that was not readily accessible. The primary officer also testified that, in his experience (which involved over 1,000 drug arrests), a "good majority" of the persons arrested for narcotic offenses within a four-block radius of where defendant made his sale were found to have drugs hidden between their buttocks.

Considering all of these circumstances, in conjunction with the fact that the police found no drugs in defendant's possession after his arrest or the strip search, the police at that point had reasonable suspicion to believe that defendant had narcotics hidden inside his body. Furthermore, the primary officer participated in the visual cavity inspection, thereby establishing that the officers who conducted the inspection had sufficient information to support the reasonable suspicion that defendant had drugs concealed in his body. Finally, the inspection was reasonable in scope and manner because it was conducted privately in a cell, without undue force and by officers of the same gender as defendant. Thus, the police conduct in this case supports the Appellate Division's conclusion that the proper constitutional standard for a legal visual body inspection was satisfied.

Once the officers saw the string-like object suspiciously hanging from defendant's rectum, their reasonable suspicion was elevated to probable cause to believe that contraband was concealed in defendant's body. Yet in *More*, we stated that probable cause alone was not enough to permit the removal of an object protruding from an arrestee's rectum. Instead, we stressed that *Schmerber* requires the police to obtain a warrant authorizing the removal of the plastic bag in the absence of exigent circum-

stances justifying an immediate seizure of the item. The suppression record in this case provides no basis for a finding of exigent circumstances since the police officers who testified at the hearing indicated that the purpose of the search was to secure evidence and there was no testimony that the drugs were in imminent danger of being destroyed, disseminated or lost, or that defendant was in medical distress. Thus, when the police physically removed the object that was attached to the string without first obtaining a warrant, they conducted an unreasonable manual body cavity search in violation of the Fourth Amendment. Under these circumstances, *More* mandates that the recovered drugs be suppressed.

Accordingly, the order of the Appellate Division should be reversed, defendant's motion to suppress granted to the extent of suppressing the drugs recovered and the indictment dismissed.

CIPARICK, J. (concurring). I agree with the Court's conclusion that the manual body cavity search at issue here is unconstitutional under *People v More* (97 NY2d 209 [2002]) and *Schmerber v California* (384 US 757 [1966]). As a result, the majority correctly concludes that the cocaine that the police forcibly removed from defendant's rectum must be suppressed. I also agree that the reasonable suspicion standard should govern strip searches conducted to disarm suspects and to prevent the destruction or concealment of contraband. I cannot, however, join the majority in holding that visual body cavity searches incident to arrest constitute an exception to the warrant requirement of the Federal and State Search and Seizure Clauses. Rather I would hold that, just like a manual body cavity search, this intrusive, degrading, and humiliating species of search may only be conducted upon a neutral and detached magistrate's issuance of a warrant based upon probable cause or upon satisfaction of *Schmerber*'s clear indication test.

The rule announced in *Schmerber* is unequivocal. The search incident to arrest exception to the warrant requirement does not apply to "searches involving intrusions beyond the body's surface" (*Schmerber*, 384 US at 769). Rather, to safeguard the interests in the "human dignity and privacy" that the Search and Seizure Clauses were designed to protect, an intrusion extending beyond the body's surface may not be undertaken on the "mere chance that desired evidence might be obtained" (*id.* at 770). It must, instead, be authorized by a warrant issued by a neutral and detached magistrate because "[t]he importance of

informed, detached and deliberate determinations of the issue whether or not to invade another's body in search of evidence of guilt is indisputable and great" (*id.*). Indeed, the Court reasoned that "[s]earch warrants are ordinarily required for searches of dwellings, and absent an emergency, no less could be required where intrusions into the human body are concerned" (*id.*).

Nonetheless, *Schmerber* does not require a warrant for all bodily intrusions. An exception to its rule is permitted if three demonstrable facts are established: a "clear indication" that relevant evidence will be found in the bodily area to be searched, an "emergency" situation in which there was "no time" to secure a magistrate's warrant and any delay threatened the imminent destruction of relevant evidence and performance of the search in a "reasonable manner" (*Schmerber*, 384 US at 770, 771).[1] We adopted the *Schmerber* test in *More* to govern "body cavity searches incident to . . . arrest" (*More*, 97 NY2d at 213). Because we did not distinguish between visual and manual body cavity searches in that case, we are now required to determine whether *Schmerber* should apply to both categories of body cavity searches.

The majority holds that visual body cavity searches are exempt from *Schmerber*'s rule and are subject to the reasonable suspicion standard because it is "reasonable" to distinguish such searches from manual body cavity searches (*see* majority op at 308-309). This is so, says the majority, because a visual body cavity search "do[es] not create a risk of physical pain or injury" and is therefore somehow less intrusive than "a physical search of an arrestee's body cavity" (*see* majority op at 309, 310). But, even assuming that that assertion is correct, it is still true that eyes—as well as fingers and tools—can intrude unreasonably upon constitutionally protected privacy rights (*see* Kamins, New York Search and Seizure § 4.01 [1], at 4-3 [2007 ed] ["Whenever it is determined that an area is one in which an individual has a

---

1. Of course, even if a warrant is issued, the search must be conducted in a reasonable manner. The majority properly acknowledges that it would require "highly unusual facts" (*see* majority op at 311 n 8) to justify a public visual body cavity search (*see e.g. Paulino v State*, 399 Md 341, 360, 924 A2d 308, 319 [2007] [combined strip and visual body cavity search conducted in well-lit parking lot, where car passengers could observe, unconstitutional because it was "unnecessarily within the public view and thus violative of the Fourth Amendment"]; *Campbell v Miller*, 499 F3d 711, 719 [7th Cir 2007] ["Courts across the country are uniform in their condemnation of intrusive searches performed in public"]; *see also People v Mitchell*, 2 AD3d 145, 147 [1st Dept 2003] ["The strip search of the defendant, in public view . . . was not reasonable"]).

reasonable expectation of privacy, the invasion of that privacy constitutes a *search* within the meaning of the Fourth Amendment . . . A search can take a variety of forms (including) . . . a visual inspection"]).

When a law enforcement official peers into the rectum of an arrestee to search for contraband, that visual inspection is clearly an intrusion into the body (*see Fuller v M.G. Jewelry*, 950 F2d 1437, 1449 [9th Cir 1991] ["*Schmerber* governs all searches that invade the interior of the body—whether by a needle that punctures the skin or a visual intrusion into a body cavity"]). The fact that "no touching" (*see* majority op at 308) occurs is immaterial because the search represents a drastic affront to human dignity and privacy, the very fundamental constitutional interests that *Schmerber*'s rule was designed to protect (*see* 950 F2d at 1449 [" 'The interests in human dignity and privacy' invaded when a public official peers inside a person's body cavity are at least as great as those invaded by a needle piercing the skin. Therefore, a body cavity inspection cannot be justified by a lesser standard than that applied in *Schmerber* for a blood test"]; *cf. United States v Oyekan*, 786 F2d 832, 839 n 13 [8th Cir 1986] ["We believe a body cavity search must be conducted consistently with the *Schmerber* factors, even though such a search does not technically require piercing the skin, because both the degree and kind of intrusion involved are of analogous proportions"]).

Indeed, it is indisputable that visual body cavity searches are degrading, humiliating, and frightening (*see Campbell v Miller*, 499 F3d 711, 718 [7th Cir 2007], quoting *Mary Beth G. v City of Chicago*, 723 F2d 1263, 1272 [7th Cir 1983] ["strip searches involving the visual inspection of the anal (and genital) area(s) are 'demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, (and) signify( ) degradation and submission' "]; *State v Clark*, 65 Haw 488, 497, 654 P2d 355, 362 [1982] ["It is humiliating and degrading to be forced to totally expose one's self to a total and hostile stranger"]; *Bell v Wolfish*, 441 US 520, 576-577 [1979, Marshall, J., dissenting] [visual body cavity searches "represent one of the most grievous offenses against personal dignity and common decency"]; *accord More*, 97 NY2d at 213 [body cavity searches incident to arrest are "invasive" and "degrading"]). Logically then—because we adopted the *Schmerber* test in *More*—our state's citizens should be entitled to as much protection from warrantless visual body cavity searches as they are from a com-

mon blood drawing procedure that "involves virtually no risk, trauma, or pain" (*see Schmerber*, 384 US at 771).

I concede that the majority's position is bolstered by the holdings of many federal circuit courts that have applied *Bell v Wolfish* (441 US 520 [1979]) to permit visual body cavity searches pursuant to a reasonable suspicion standard (*see* majority op at 308-309). But it is notable that the main factor motivating several of those courts to adopt the *Wolfish* test— the need to maintain institutional security—is wholly lacking support on this record (*see Swain v Spinney*, 117 F3d 1, 8 [1st Cir 1997] ["(T)he most compelling justification for warrantless strip and visual body cavity searches is institutional security"]; *see also Mary Beth G.*, 723 F2d at 1273; *Blackburn v Snow*, 771 F2d 556, 564 [1st Cir 1985]). And, as the majority acknowledges, the U.S. Supreme Court has reserved on the issue of whether the Fourth Amendment permits warrantless strip searches performed incident to arrest (*see Illinois v Lafayette*, 462 US 640, 646 n 2 [1983]).

The Ninth Circuit has concluded that visual body cavity searches of arrestees are subject to *Schmerber* (*see Fuller*, 950 F2d at 1449). The courts in at least one other state agree (*see Hughes v Commonwealth*, 31 Va App 447, 460, 524 SE2d 155, 162 [2000] ["Probable cause to believe a suspect possesses drugs, which justifies a search of an individual, does not justify a strip or body cavity search unless the evidence or circumstances specifically provides the officers with a 'clear indication' that the contraband is concealed in a body cavity"]; *cf. Moss v Commonwealth*, 30 Va App 219, 224-226, 516 SE2d 246, 249-250 [1999] [applying *Schmerber* test to strip search]). Thus, the judicial consensus on the propriety of visual body cavity searches is far from settled (*see* 3 LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 5.3 [c], at 167 [4th ed] ["(T)here is still a need to scrutinize closely those searches incident to arrest which involve inspections of or intrusions into the body"]).[2]

In any event, *Wolfish* should not govern visual body cavity searches incident to arrest (*see Fuller*, 950 F2d at 1448 [absent record evidence that arrestees "ever intermingled with the gen-

---

**2.** In two cases decided after *Wolfish*, the courts of last resort in Hawaii and Louisiana held that *Schmerber* applies to body cavity searches conducted incident to arrest (*see State v Clark*, 65 Haw 488, 497, 654 P2d 355, 362 [1982]; *State v Fontenot*, 383 So 2d 365, 367 [La 1980]). Those cases, however, concerned manual body cavity searches and did not express a view on the applicability of *Schmerber* to visual body cavity searches.

eral jail population . . . the rationale underlying *Wolfish* . . .—which only allows strip searches of detainees with less than probable cause where the objective is to discover weapons or contraband—does not apply to the instant case"]; *see also Commonwealth v Gilmore*, 27 Va App 320, 330 n 5, 498 SE2d 464, 469 n 5 [1998] ["The analytical framework set forth in *Wolfish* is inapplicable . . . Because a person who is searched incident to arrest is not yet incarcerated, he or she has greater constitutional protection than a pretrial detainee. As such, this case is controlled by the principles set forth in *Schmerber*"]). *Wolfish* did not overrule *Schmerber*. Instead it recognized that the Fourth Amendment standard of reasonableness is a flexible one that requires "balancing . . . the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted" (*Wolfish*, 441 US at 559).

I respectfully submit that—in the context of visual body cavity searches incident to arrest—the proper balance of constitutional interests has already been struck—in *Schmerber* (*see Fuller*, 950 F2d at 1448; *Hughes*, 31 Va App at 460, 524 SE2d at 162; *Gilmore*, 27 Va App at 330 n 5, 498 SE2d at 469 n 5). In *Wolfish*, there was a reason to tip the scales towards the government, namely record evidence that the federal pretrial detention facility at issue there was a "unique place fraught with serious security dangers," where "[s]muggling of money, drugs, weapons, and other contraband is all too common an occurrence" (441 US at 559). As the majority admits, however, the record before us contains no evidence of parallel security concerns plaguing the 26th Precinct station house (*see* majority op at 309). Instead, the record demonstrates that: at least 12 holding cells, some of which were located 20 feet from the station house desk, were available for searching arrestees, another 14 detention cells were available for "overnight lodging," and that defendant's cohort was searched in a cell separate from him.[3] Thus, the Appellate Division's reliance upon *Wolfish* is misplaced.

---

**3.** Because constitutional search and seizure protections are flexible, I do not foreclose the possibility that a particular station house may experience the same security concerns at issue in *Wolfish*. If such legitimate concerns caused by, for example, cell overcrowding, were established by record evidence, then

Moreover, the balance struck in *Wolfish* was predicated on the assumption that "convicted prisoners" and "pretrial detainees" merely retained "some" Fourth Amendment rights upon their commitment (*see* 441 US at 558). Here, in contrast, we deal with an arrestee, who at the time of the search had not yet even been arraigned and who was therefore entitled—at the very least—to enjoy greater constitutional protection than a pretrial detainee, who was remanded to supervision following arraignment, or a convicted prisoner (*Gilmore*, 27 Va App at 330 n 5, 498 SE2d at 469 n 5; *cf. Block v Rutherford*, 468 US 576, 583 [1984] ["The very fact of nonrelease pending trial . . . is a significant factor bearing on the security measures that are imperative to the proper administration of a detention facility"]; *People ex rel. Maxian v Brown*, 77 NY2d 422, 427 [1991] [noting that "the deprivation entailed by prearraignment detention is very great (and is) . . . one as to which no predicate is established in advance and, indeed, which may ultimately be found to have been unwarranted" (internal quotation marks omitted)]; *State v Bayaoa*, 66 Haw 21, 25 n 2, 656 P2d 1330, 1332 n 2 [1982] ["at least with regard to the fourth amendment, the rights of persons not yet convicted of crimes must be more closely scrutinized than the rights of prisoners"]).

Application of the reasonable suspicion standard in this case is also particularly inappropriate because we have stated that that standard applies to searches that are "uniquely discriminate" and "nonintrusive" (*see e.g. People v Dunn*, 77 NY2d 19, 26 [1990] [canine sniff search of apartment hallway subject to reasonable suspicion standard because "(i)t does not entail entry into the premises or exposure of one's personal effects to the police"]; *see also People v Cantor*, 36 NY2d 106, 112-113 [1975] [reasonable suspicion standard applies to authority of police officers to stop and inquire of citizens in public place]). And the U.S. Supreme Court has applied the standard to the detention of suspected smugglers at national borders, where the interests of the individual are greatly outweighed by those of the government (*United States v Montoya de Hernandez*, 473 US 531, 541-542 [1985]). Even in that context, however, the Court made clear that "[t]he 'reasonable suspicion' standard" is intended to "effect[ ] a needed balance between private and public interests when law enforcement officials must make a limited intrusion

those facts could constitute an exigent circumstance under the *Schmerber* test.

on less than probable cause" (*id.* at 541). A visual body cavity search, however, cannot be characterized as a "limited intrusion."

Nor can visual body cavity searches be justified under our precedents recognizing an officer's right to conduct a limited search incident to arrest. Such a search is constitutionally permissible based upon two exigent circumstances: the need to protect the safety of the arresting officer and the need to prevent the destruction of evidence (*see People v Evans*, 43 NY2d 160, 165 [1977]; *Chimel v California*, 395 US 752, 763 [1969]). We have explained that such searches are permitted because they represent de minimis intrusions when compared with the loss of liberty occasioned by the arrest that preceded them (*see People v De Santis*, 46 NY2d 82, 87 [1978], *overruled on other grounds by People v Belton*, 55 NY2d 49 [1982]; *cf. People v Perel*, 34 NY2d 462, 467 [1974] [explaining, in context of inventory search, that "(g)iven the nature of the gross intrusion by detention of the person it is reasonable to conduct a less intrusive search of his person and the possessions he carried with him"]). Thus, a warrantless search is not justified when "the intrusion required for [it] is of a greater magnitude than the gross personal intrusion of the arrest and the personal search incident to it" (*see Perel*, 34 NY2d at 468). Here, the visual body cavity search was unjustified because the inspection of defendant's highly private and intimate areas greatly exceeded the magnitude of the intrusion occasioned by his arrest and the pat-down search incident to it.

Most importantly, given "our strong preference for search warrants" (*see People v Hanlon*, 36 NY2d 549, 558 [1975]), we must identify reasons for dispensing with the warrant requirement in particular cases (*see Brigham City, Utah v Stuart*, 547 US 398, 403 [2006], quoting *Mincey v Arizona*, 437 US 385, 393-394 [1978] ["(W)arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment"]). Critically, the ease of obtaining evidence of criminal conduct is not a relevant consideration in this inquiry (*see Mincey*, 437 US at 393 ["(T)he mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment. The investigation of crime would always be simplified if warrants were unnecessary" (citation omitted)]; *see also Schmerber*, 384 US at 770 ["In the

absence of a clear indication that in fact such evidence will be found . . . fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search"]; *cf. People v Gokey*, 60 NY2d 309, 312, 313 [1983] [lack of "exigent circumstances" rendered search of bag impermissible where defendant was handcuffed and "(t)he police officers' interest in the bag focused solely on the possibility that it contained marihuana"]). Exigencies threatening officer safety or the imminent destruction of evidence are valid justifications for dispensing with the warrant requirement (*see e.g. Evans*, 43 NY2d at 165). But once an arrest has occurred, these important factors lose much of their force (*see e.g. Gokey*, 60 NY2d at 313-314 [warrantless search impermissible where defendant was handcuffed and surrounded by officers because the "police . . . did not fear for their safety, and because they could not have reasonably believed that the search of the bag was necessary to preserve any evidence"]).

Therefore, in the context of a station house visual body cavity search, where an arrestee can be segregated, monitored and secured pending the issuance of a warrant and there is no record evidence of any exigency threatening safety and security or the imminent destruction of evidence, the police must obtain a warrant or proceed under *Schmerber*'s clear indication test (*see Clark*, 65 Haw at 497, 654 P2d at 362, citing *Fontenot*, 383 So 2d at 367 ["(T)he police could have detained and watched defendant . . . so as to prevent destruction of evidence during the short delay caused by getting a warrant. This burden on the police does not raise this situation to the level of an emergency"]). Any exception to this rule would authorize warrantless visual body cavity searches solely to secure evidence of criminality. That should not be permitted.

The probable cause standard could be met in many cases where visual body cavity searches would aid law enforcement (*see* CPL 70.10 [2]). Like the reasonable suspicion standard, its contours are equally clear: "the information [contained in the warrant application] must be sufficient to warrant a person of reasonable caution in the belief that . . . evidence of a crime w[ill] be found in a particular place" (*People v P.J. Video*, 68 NY2d 296, 300 [1986]). In evaluating the warrant application, the magistrate must consider "all aspects of the information supporting [it]," including "the experience and expertise of the officers involved" and "the nature of the crime and the exigencies, if any, involved" (*see id.* at 306 [emphasis omitted]). Under

this standard, a magistrate could certainly approve a visual body cavity search of a narcotics arrestee.

Indeed, several facts could support a proper warrant application, including officers witnessing a defendant secrete narcotics, suspicious movements consistent with storage of a foreign substance in a body cavity, defendants' admissions, and reliable information obtained from police sources (*see People v Jones*, 3 Misc 3d 481, 482 n 2, 485-486 [Sup Ct, Bronx County 2004] [police had "probable cause" where observing officer witnessed arrestee "put the drugs down the back of his pants"]; *People v Perry*, 6 Misc 3d 1028[A], 2005 NY Slip Op 50219[U], *5 n 5, *4-5 [Sup Ct, Queens County 2005] [police had "clear indication" that arrestee had secreted drugs in rectum where, after being segregated in a cell pending issuance of warrant, he behaved erratically "and was observed wiggling his body . . . (and) reaching into the back of his pants and putting his hand to his mouth"]; *cf. People v Kelley*, 306 AD2d 699, 700 [3d Dept 2003] [factors that courts consider to determine reasonableness of strip searches include "defendant's excessive nervousness, unusual conduct, information showing pertinent criminal propensities, informant's tips, loose-fitting or bulky clothing, an itinerary suggestive of wrongdoing, incriminating matter discovered during a less intrusive search, lack of employment, indications of drug addiction, information derived from others arrested or searched contemporaneously, and evasive or contradictory answers to questions"]).

In any event, had the police monitored defendant in a holding cell, additional facts may have come to light that could have permitted a visual body cavity search under the *Schmerber* test (*see Perry*, 2005 NY Slip Op 50219[U] at *2 [after police attempted to obtain warrant, exigent circumstances arose when they observed defendant put "his hand down the rear of his underwear in the area of his anus" and then begin to eat something]; *cf. People v Barnville*, 31 AD3d 271, 272-273 [1st Dept 2006] [because of "the trained, experienced officer's observation of defendant, at a notorious drug location, retrieving an item from his buttocks area and exchanging it for money from a person found in possession of drugs minutes later, the fruitless search of defendant's outer garments, and the knowledge that drug dealers often store drugs within their buttocks or rectum—there was sufficient evidence to support not only probable cause to arrest for a drug sale, but an objective, particularized, reasonable belief that defendant was secreting contraband in the area of his buttocks"]).

That there are any number of factual situations in which probable cause to conduct a visual body cavity search could be satisfied underscores the fact that "[i]n dealing with probable cause . . . we deal with probabilities" (*see Brinegar v United States*, 338 US 160, 175 [1949]). But when the assessment of those probabilities can lead to an intrusion upon human dignity and privacy as grievous and degrading as a visual body cavity search, then such assessment—absent exigent circumstances not present here—should be made by a neutral and detached magistrate (*see Hanlon*, 36 NY2d at 558 [warrant requirement "is designed to interpose the detached and independent judgment of a neutral Magistrate between the interested viewpoint of those engaged in ferreting out crime and the potential encroachments on the sanctity and privacy of the individual"]).

In conclusion, I concur in the result that the majority reaches today, but I cannot join in the full breadth of its reasoning. The fundamental constitutional interests of human dignity and bodily integrity are not only implicated when intimate bodily areas are touched. A visual intrusion into a body cavity is an "intrusion beyond the body's surface" and thus, the *Schmerber* test must apply to such searches as well as manual body cavity searches. I would therefore grant defendant's motion to suppress the drugs and dismiss the indictment.

SMITH, J. (dissenting in part). I agree that, for the reasons explained in Judge Graffeo's opinion, the visual search did not violate defendant's constitutional rights. I think the seizure of the contraband was lawful also, and therefore I would deny the motion to suppress.

The visual search, which we today hold valid, led officers Burnes and Spiegel to observe a string hanging from defendant's rectum. The record shows that Burnes twice ordered defendant to remove the string, and warned him that if defendant did not do so, Burnes would do it himself. Defendant remained motionless. Burnes and Spiegel then held defendant's arms and forced him into a bent position. Burnes pulled the string, and a plastic bag containing rocks of crack cocaine came out "easily." There is no evidence that either officer put a hand or implement in defendant's body, or even touched him below the waist.

The majority holds that, when defendant refused to cooperate, the officers had to leave the contraband where it was until they got a search warrant. In that situation, getting the warrant seems to me a pointless exercise, and I do not believe the State or Federal Constitution requires it.

The general rule, of course, is that a person arrested can be searched without a warrant. In *Schmerber v California* (384 US 757 [1966]), the Supreme Court established an exception for searches that intrude into the human body. "Search warrants," the Court said in *Schmerber*, "are ordinarily required for searches of dwellings, and absent an emergency, no less could be required where intrusions into the human body are concerned" (384 US at 770). I find *Schmerber* inapplicable here, for the simple reason that no one intruded into defendant's body. There is no evidence that any hand or implement was inserted, or that the officers' actions had any significant internal effect on defendant. All Burnes did was pull on a plainly visible string, causing the contraband to emerge with no difficulty. There is no claim that this action caused defendant any pain, or put him at risk of injury. The removal of the contraband in this case seems to me a lesser violation of privacy than the lawful search that led to its discovery.

The majority relies on *People v More* (97 NY2d 209 [2002]) to hold that *Schmerber* governs this case. It is true that we applied *Schmerber* in *More*, and that we held the removal of drugs from defendant in that case unconstitutional, but the facts in *More* were different from the facts here.

Our statement of the central facts in *More* is brief: "Defendant initially cooperated by taking off most of his clothes, but at some point he protested and scuffled with the officers. During the search, which took place in a bedroom, the police removed a plastic bag, an outer portion of which they saw protruding from defendant's rectum" (97 NY2d at 212). Defendant's brief in our Court, however, was more detailed and less delicate:

> "Officer Schoonmaker grabbed Appellant and called for help, claiming that he saw a piece of cellophane protruding from appellant's anus. Appellant was immediately surrounded by police officers. A struggle ensued as the officers attempted to reach into the appellant's rectum. Appellant resisted the assault for three or four minutes in spite of the fact that 5 or 6 officers were trying to wrestle him to the ground. Eventually, he was incapacitated by the police. One officer was holding each leg, one officer was lying on top of his head and one officer was holding each of his arms. The defendant was handcuffed. His face was forced into the floor and his buttocks forced up to the ceiling. At this point, as

Appellant continued to struggle, an unknown officer called for a flashlight. Another unknown officer came in and shined a flashlight into the rectum of the Appellant. Detective Sergeant Wilson put on a rubber glove and proceeded to enter the rectum of the Appellant. He groped and probed extensively. As it turned out, the baggie that Officer Schoonmaker had earlier testified was protruding from the appellant, was, instead, other officers testified, so far inside the appellant that it was barely visible to the naked eye and was very difficult to remove. So much force was used to accomplish the extraction that the baggie was covered with blood and human tissue." (Appellant's brief, *People v More*, at 5-6 [record references omitted].)

The People's brief in *More* did not challenge this summary of the way the evidence was retrieved. In light of that, I find it unsurprising that our opinion in *More* simply assumes, without discussion, that the search involved an intrusion "beyond the body's surface" (97 NY2d at 212) and that *Schmerber* therefore applied. There is another important difference between the *More* facts and ours: the officers in *More* did not have reason to suspect, before performing a visual body cavity search, that the defendant was concealing drugs inside his body. He had been arrested when police officers found him sitting near a crack pipe and a small piece of crack cocaine. Our opinion in *More* seems to reflect the belief—well justified by the record in that case—that even the visual body cavity search was unlawful. Among the authorities we relied on were *Mary Beth G. v City of Chicago* (723 F2d 1263 [7th Cir 1983]) and *Arruda v Fair* (710 F2d 886 [1st Cir 1983], *cert denied* 464 US 999 [1983]), both of which involved only visual searches (*see* 97 NY2d at 213).

We should not treat *More* as being conclusive on an issue not presented or discussed in that case: whether, when an object protruding from a body cavity is found during a lawful search, the removal of that object without intrusion into the body requires a warrant under *Schmerber*. No other New York case decides the question, and decisions from other jurisdictions are of limited help, though several give some indirect support to the People's position here (*see United States v Himmelwright*, 551 F2d 991 [5th Cir 1977] [removal during border search not unlawful]; *State v Jones*, 76 Wash App 592, 887 P2d 461 [1995] [removal not a body cavity search under state statutes]; *State v*

*Nieves,* 383 Md 573, 586, 861 A2d 62, 70 [2004] [search held unlawful for lack of reasonable suspicion, but court concluded that removal of protruding bags was not "a physical body cavity search"]). In a case almost identical to ours, *State v Barnes* (215 Ariz 279, 159 P3d 589 [2007]), an intermediate appellate court in Arizona divided 2 to 1 in the defendant's favor.

I agree with Judge Espinosa, dissenting in *Barnes,* who said: "It makes little sense . . . to require officers to obtain a warrant in cases such as this, where contraband is visible between the cheeks of the buttocks and may be retrieved easily, without harm to the individual" (215 Ariz at 285, 159 P3d at 595). I do not see why it is unreasonable for the officers to take, with minimal force, what they have already lawfully seen (*cf. Horton v California,* 496 US 128 [1990] [lawful to seize object in plain view]). The majority's contrary holding will, I fear, add unnecessarily to the many problems faced by police officers trying to make headway against street drug dealers.

Accordingly, I would affirm the order of the Appellate Division.

Chief Judge KAYE concurs with Judge GRAFFEO; Judge CIPARICK concurs in result in a separate opinion in which Judge JONES concurs; Judge SMITH dissents and votes to affirm in another opinion in which Judges READ and PIGOTT concur.

Order reversed, etc.