# SUPREME COURT OF THE STATE OF NEW YORK
## *Appellate Division, Fourth Judicial Department*

**1115**
**KA 13-00437**
PRESENT: SCUDDER, P.J., PERADOTTO, CARNI, SCONIERS, AND WHALEN, JJ.

THE PEOPLE OF THE STATE OF NEW YORK, APPELLANT,

V                                           MEMORANDUM AND ORDER

ROBERT L. INGRAM, DEFENDANT-RESPONDENT.

FRANK A. SEDITA, III, DISTRICT ATTORNEY, BUFFALO (DAVID A. HERATY OF COUNSEL), FOR APPELLANT.

THE LEGAL AID BUREAU OF BUFFALO, INC., BUFFALO (SHERRY A. CHASE OF COUNSEL), FOR DEFENDANT-RESPONDENT.

---------------------------------------------------------------------------------------------------------

Appeal from an order of the Supreme Court, Erie County (Russell P. Buscaglia, A.J.), dated November 30, 2012.  The order granted that part of the omnibus motion of defendant to suppress physical evidence and his oral statements to the police.

It is hereby ORDERED that the order so appealed from is affirmed.

Memorandum:  The People appeal from an order granting that part of defendant's omnibus motion to suppress physical evidence, i.e., a handgun, and defendant's oral statements to the police.  The People contend that the police had the requisite reasonable suspicion to justify their pursuit of defendant, and that suppression of the evidence and oral statements thereafter obtained from defendant is not warranted.  We reject that contention and, inasmuch as Supreme Court's suppression determination is supported by the record (*see People v Martinez*, 105 AD3d 1458, 1459; *see generally People v Prochilo*, 41 NY2d 759, 761), we affirm the order.

The testimony at the suppression hearing established that, on March 25, 2012, a housing officer of the Buffalo Police Department received a tip from an unnamed arrestee that there were two guns "stashed behind" a house located at 118 Montana Avenue in the City of Buffalo.  The area in which the house was located was known to the officer and his partner as a high-crime area.  At approximately 4:40 p.m. on that date, the two officers drove their patrol vehicle to that house to investigate the tip.  Upon turning onto Montana Avenue, the officers saw two men near the curb in front of house number 116 or 118, crossing the street toward house number 119.  The officer driving the patrol vehicle recognized one of the men as the victim of a recent shooting, and he stopped the patrol vehicle to speak with him.  That man stopped to talk to the officer, but his companion—defendant—began walking away "swiftly."  The second officer, curious as to why

defendant was "going away so fast," exited the patrol vehicle and asked defendant his name.  According to the testimony of the second officer, defendant did not respond, but turned around, "grabbed the right side of his jacket," and "tried to pull something out of it." The second officer yelled at defendant, "don't do it," but defendant continued to pull at his jacket pocket.  The second officer drew his pistol and pointed it at defendant, while continuing to yell, "don't do it."  Defendant then began to run away, although we note that the second officer provided conflicting testimony whether defendant had begun to run away before he yelled at defendant.  The two officers pursued defendant, ultimately apprehending him and recovering a loaded handgun from his jacket pocket.  Notably, the officers testified that defendant and his companion were doing nothing illegal when they first saw them, and that they became suspicious only because defendant and his companion were in the vicinity of the house identified in the tip. Furthermore, the first officer testified that, although defendant's jacket was "thin," he did not see the outline of a weapon in defendant's jacket, and the second officer testified that he did not see a bulge or the outline of a weapon in defendant's jacket until after he began to pursue defendant.

The People contend that the court erred in determining that the tip the officer received from the unnamed arrestee was unreliable. According to the People, the record establishes that the tip was reliable and the court therefore should have considered the tip as a factor in support of a determination that the officers had the requisite reasonable suspicion to justify their pursuit of defendant, particularly inasmuch as defendant was standing near the house identified in the tip (*see generally People v De Bour*, 40 NY2d 210, 222-223).  We reject that contention.  The People contend that the tip was reliable because it was based upon the arrestee's personal knowledge and because "it is against the law to provide the police with false information about a crime."  Even assuming, arguendo, that the arrestee's basis of knowledge was sufficient because he had personally observed guns "stashed" behind house number 118, we conclude that the People did not establish "that the specific information given [by the arrestee was] reliable" (*People v DiFalco*, 80 NY2d 693, 697; *see generally People v Johnson*, 66 NY2d 398, 402-402).  The arrestee did not provide the officer with any information about who placed the guns behind house number 118, the precise location of the guns behind the house, or the type of guns.  Moreover, the officer previously had never met the arrestee or received reliable information from him.

We further conclude that the court properly determined that, when the officers initially approached defendant, they had no more than an "objective, credible reason" to request information (*People v Moore*, 6 NY3d 496, 498-499, citing *De Bour*, 40 NY2d at 223).  The officers acknowledged at the suppression hearing that there was nothing about the behavior of defendant or his companion that the officers found suspicious other than their proximity to house number 118.  Although there was some testimony that defendant was standing in front of house number 118 when the officers first saw him, the court did not find that testimony credible but, rather, credited other testimony that

defendant was standing in front of house number 116.  That credibility determination is entitled to great deference (*see Prochilo*, 41 NY2d at 761; *Martinez*, 105 AD3d at 1459).  Furthermore, the first officer testified that he did not ask defendant's companion from where he was coming, nor did either officer testify that he saw the direction from which defendant was coming, and thus there is no credible evidence in the record supporting the claim that defendant was connected with the guns allegedly "stashed behind" house number 118.  Defendant's presence on the curb in the general vicinity of house number 116 was " 'readily susceptible of an innocent interpretation,' " i.e., that defendant was simply crossing the street (*People v Riddick*, 70 AD3d 1421, 1422, *lv denied* 14 NY3d 844), and "[t]he fact that defendant was located in a high[-]crime area does not by itself justify the police conduct where, as here, there were no other objective indicia of criminality" (*People v Stevenson*, 273 AD2d 826, 827).  We therefore conclude that, at the time the officers approached defendant and his companion, they were limited to a level one intrusion, i.e., a request for information (*see generally De Bour*, 40 NY2d at 223).  Thus, the second officer's request for defendant to give his name was permissible.

We reject the People's contention that subsequent events gave rise to a reasonable suspicion that defendant had committed or was about to commit a crime, as was required to justify the police pursuit of defendant when defendant did not respond to the officer's question (*see People v Cady*, 103 AD3d 1155, 1156; *Riddick*, 70 AD3d at 1422).  We have previously held that " 'the fact that defendant reached for his waistband, absent any indication of a weapon such as the visible outline of a gun or the audible click of the magazine of a weapon, does not establish the requisite reasonable suspicion that defendant had committed or was about to commit a crime' " (*Cady*, 103 AD3d at 1156; *see Riddick*, 70 AD3d at 1422-1423).  Here, although defendant was reaching for his jacket pocket as he walked or ran away from the second officer, neither officer testified that he saw a bulge or the outline of a weapon in defendant's jacket.  Rather, the second officer believed that defendant had a gun only because, in his experience, if an individual pulled vigorously at an object in his or her pocket, but the object did not come out easily, that object usually was a weapon. While we are mindful that an officer may rely on his or her knowledge and experience in determining whether reasonable suspicion exists, we respectfully disagree with our dissenting colleagues that the above circumstances were sufficient to establish the requisite reasonable suspicion "in the absence of other objective indicia of criminality" (*Cady*, 103 AD3d at 1156 [internal quotation marks omitted]; *see Riddick*, 70 AD3d at 1423).  Here, before pursuing defendant, the second officer knew only that defendant was walking across the street in a high-crime area, in the general vicinity of a house where an unnamed person of unestablished reliability claimed to have seen guns, and that, when the police approached, defendant walked or ran away while grabbing at his jacket pocket.  We cannot conclude, based on the totality of those circumstances, that the police were justified in pursuing defendant (*see People v Holmes*, 81 NY2d 1056, 1058; *Cady*, 103 AD3d at 1155-1156; *Riddick*, 70 AD3d at 1421-1423).

We note that, although it appears from the dissent that there was testimony at the suppression hearing that defendant took an "aggressive fighter stance," there was no such testimony.  Rather, that phrase was used only by defense counsel, when reading the second officer's testimony from the transcript of the felony hearing, in an attempt to impeach the officer regarding when he drew his service revolver.  Thus, there was no evidence before the suppression court that defendant took an "aggressive fighter stance" (*see People v Hall*, 208 AD2d 1044, 1046; *People v Blanchard*, 177 AD2d 854, 856, *lv denied* 79 NY2d 918; *People v Gilman*, 135 AD2d 951, 952-953, *lv denied* 71 NY2d 896).

The People's reliance on *People v Bachiller* (93 AD3d 1196, 1196-1198, *lv dismissed* 19 NY3d 861) is misplaced.  In that case, the police were responding to a report of a possible stabbing when they noticed the defendant in a "heated argument" with another man and then saw the defendant chase that man through adjacent backyards (*id.* at 1196).  The defendant conceded that "the report of a possible stabbing coupled with the responding officer's observations at the scene furnished the police with the requisite 'founded suspicion that criminal activity [was] afoot' sufficient to justify the common-law right of inquiry" (*id.*, quoting *Moore*, 6 NY3d at 498).  Having obtained the requisite founded suspicion, the police then observed the defendant walk briskly away from them and "grab and hold onto an object in his waistband area" (*id.* at 1197).  In determining that suppression was not warranted, we noted that the defendant "was not simply reaching in the direction of his waistband.  Rather, the two officers as well as the initial responding officer, who was also pursuing defendant, testified that defendant was *clutching an object that appeared to be a gun* at his waistband" (*id.* at 1198 [emphasis added]).  Here, neither officer testified that he observed any object—let alone an object that appeared to be a gun—in defendant's pocket before beginning to pursue defendant.

All concur except SCUDDER, P.J., and PERADOTTO, J., who dissent and vote to reverse in accordance with the following Memorandum:  We respectfully dissent.  In our view, the two Buffalo Police Department Housing Officers (officers) had the requisite reasonable suspicion to pursue defendant.  We would therefore reverse the order, deny that part of the omnibus motion seeking suppression of physical evidence and defendant's oral statements to the police, and remit the matter for further proceedings on the indictment.

After he was indicted on a charge of criminal possession of a weapon in the second degree (Penal Law § 265.03 [3]), defendant sought suppression of the handgun that had been seized from his jacket pocket on the ground that the officers lacked reasonable suspicion to pursue him.  At the suppression hearing, the officers testified that they had received information from a person one of the officers had arrested earlier in the day concerning "possible weapons stashed behind a house" on Montana Avenue.  The area around Montana Avenue was a high-crime area where there had been numerous arrests for narcotics and gun violence.  Moreover, several people had been murdered in that area during the year in which this incident took place.  Upon approaching

the area, the officers observed defendant and a second man standing on a curb near the house in question. The man with defendant had recently been the victim of a shooting, and the officers stopped their patrol vehicle so the first officer could ask defendant's companion if he had any new information concerning that shooting. At that point, defendant "glanced in [the officers'] direction, his eyes got very big, and then he looked down and walked away . . . very swiftly." Defendant's pace then escalated to a run. The second officer exited the patrol vehicle "just to see why [defendant] was going away so fast." Defendant did not respond when asked for his name, but turned toward the second officer in an "aggressive fighter stance," grabbed the right side of his jacket, and "vigorously" struggled to pull something out of it. The second officer yelled at defendant, "don't do it," because the officer "believed that [defendant] had a weapon and he was trying to pull it out of his jacket." The second officer testified that his belief was based on having been "involved in numerous weapons arrest[s] and most likely every single time when they're vigorously pulling something out of their coat[ and] it doesn't come out easily, it's normally a weapon." As defendant continued trying to pull something out of his coat, the second officer "pulled out [his] pistol, pointed it at [defendant], [and] told him again, don't do it." When defendant started running, the officers pursued him, caught him, and recovered a handgun from his coat pocket.

"[I]t is well settled that the police may pursue a fleeing defendant if they have a reasonable suspicion that [the] defendant has committed or is about to commit a crime . . . Flight alone is insufficient to justify pursuit because an individual has a right to be let alone and refuse to respond to police inquiry . . . However, a defendant's flight in response to an approach by the police, *combined with other specific circumstances indicating that the suspect may be engaged in criminal activity*, may give rise to reasonable suspicion, the necessary predicate for police pursuit" (*People v Riddick*, 70 AD3d 1421, 1422, *lv denied* 14 NY3d 844 [internal quotation marks omitted]; *see People v Holmes*, 81 NY2d 1056, 1058; *People v Martinez*, 80 NY2d 444, 446). "Reasonable suspicion represents that 'quantum of knowledge sufficient to induce an ordinarily prudent and cautious [person] under the circumstances to believe criminal activity is at hand' " (*Martinez*, 80 NY2d at 448).

While each individual act of defendant was insufficient on its own to provide the officers with the reasonable suspicion necessary to pursue and to detain him forcibly, we note that the Court of Appeals has recognized that it is the combination of flight and "other specific circumstances indicating that [a] suspect may be engaged in criminal activity" that may give rise to reasonable suspicion (*People v Sierra*, 83 NY2d 928, 929; *see People v Cady*, 103 AD3d 1155, 1156). "In determining whether a police officer has reasonable suspicion to justify his [or her] actions, 'the emphasis should not be narrowly focused on . . . any . . . single factor, but [rather should be] on an evaluation of the totality of circumstances, which takes into account the realities of everyday life unfolding before a trained officer' " (*People v Stephens*, 47 AD3d 586, 589, *lv denied* 10 NY3d 940).

We agree with the majority that " '[t]he [suppression] court's determination is entitled to great deference and will not be disturbed where it is supported by the record' " (*People v Martinez*, 105 AD3d 1458, 1459; *see People v Howington*, 96 AD3d 1440, 1441; *People v Davis*, 48 AD3d 1120, 1122, *lv denied* 10 NY3d 957), but we find it disturbing that Supreme Court failed to consider the testimony of the second officer that, based on his prior experience, when someone is vigorously trying to pull an object out of a coat pocket and the object does not come out easily, that object is "normally a weapon." It is well settled that the police "are allowed to 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person' " (*People v Hall*, 10 NY3d 303, 311, *cert denied* 555 US 938; *see People v Brown*, 151 AD2d 199, 203, *lv denied* 75 NY2d 768). Although we have consistently held that the mere fact that a person reaches for his waistband, "absent any indication of a weapon such as the visible outline of a gun or the audible click of the magazine of a weapon, does not establish the requisite reasonable suspicion that defendant ha[s] committed or [is] about to commit a crime" (*Riddick*, 70 AD3d at 1422-1423; *see Sierra*, 83 NY3d at 929-930; *Cady*, 103 AD3d at 1156), we conclude that here, based on the experience of the second officer, there was an indication of a weapon, i.e., defendant took an "aggressive fighter stance" and was "vigorously" struggling to remove something from his coat pocket. Moreover, the facts in *Riddick*, a case relied on by the majority, are distinguishable. In that case, the officers were in an unmarked car and were on a routine patrol. There was no specific tip concerning weapons, and there was no evidence that the defendant knew that the officers were police officers when he walked away from their unmarked van. While the defendant in *Riddick* made a "gesture" toward his waistband, there was no testimony that the gesture was aggressive or vigorous or that such a gesture was indicative of a weapon (*id.* at 1422-1424). Although a coat pocket may not be as common a location for a weapon, we conclude that the second officer's experience with weapons in coat pockets should have been considered by the court (*see People v Benjamin*, 51 NY2d 267, 271; *People v Bachiller*, 93 AD3d 1196, 1198, *lv dismissed* 19 NY3d 861). Indeed, in *People v Pines* (281 AD2d 311, 311-312, *affd* 99 NY2d 525), the defendant, who was walking in the street with a companion, noticed the officers' unmarked but recognizable vehicle, after which "his eyes bulged out" (*id.* at 311). As the officers approached, the "defendant 'bunched up' his bubble jacket on the right side, at the waist area, with his hand cupped underneath it' " (*id.* at 312). The officer in *Pines* stated that the defendant's action "remind[ed him] of how he himself, when off-duty, sometimes adjusted his gun in a similar manner" (*id.*). The Appellate Court relied upon that testimony in holding that the pursuit was justified (*id.*). In both *Pines* and the instant case, the knowledgeable and experienced officer observed conduct by the defendant that was indicative of a weapon.

In addition, the officers in this case had received a tip from an arrestee, i.e., an identified citizen informant, that there were guns stashed in the area where they observed defendant and his companion.

While we agree with the majority that there was no information establishing the reliability of the tip, such information may still be relied upon in a *De Bour* analysis. "Regardless of whether . . . the citizen-informant's basis of knowledge was sufficiently established . . . , the combination of his report to the police and the officers' observations . . . provided the requisite reasonable suspicion" (*Matter of Shallany S.*, 11 AD3d 414, 414; *see People v Gresty*, 237 AD2d 931, 932).

We therefore conclude that, based on the combination of the tip, the high-crime location, the presence of a recent shooting victim, defendant's initial behavior and his conduct indicative of a weapon, the officers had the requisite reasonable suspicion for the pursuit.