Michael MILLS, Appellant,

v.

UNITED STATES, Appellee.

No. 94–CM–314.

District of Columbia Court of Appeals.

Argued Nov. 20, 1996.

Decided Oct. 21, 1997.

Rehearing Denied En Banc May 26, 1998.

Samia Fam, Public Defender Service, with whom James Klein and Allie J. Sheffield, Public Defender Service, were on the brief, for appellant.

Brenda Baldwin White, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, at the time the brief was filed, and John R. Fisher and Elizabeth Trosman, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and RUIZ and REID, Associate Judges.

REID, Associate Judge:

Appellant Michael Mills entered a guilty plea to charges of possession of a prohibited weapon, in violation of D.C.Code § 22–3214(a) (1996); possession of an unregistered firearm, in violation of D.C.Code §§ 6–2311, –2376 (1995); and possession of unregistered ammunition, in violation of D.C.Code §§ 6–2361, –2376.[1] He preserved his right to challenge his conviction on the ground that

1. Imposition of sentence on each of the counts was suspended, and he was ordered, concurrently, to perform one hundred hours of community service and placed on two years probation (unsupervised after the completion of community service).

the trial court erroneously denied his motion to suppress his statements, as well as physical evidence seized from an automobile. We affirm.

## FACTUAL SUMMARY

On July 31, 1993, around 6:50 p.m., an anonymous person made a call to the police to report that a heavy set man, weighing about 300 pounds and wearing blue jeans and a green shirt, had a gun and was standing by a black pick-up truck in the parking lot of the Normandy liquor store at First and M Streets, S.E. Officers Eric Levenberry[2] and Frank Grosso responded to the radio broadcast regarding the anonymous call. They found appellant Michael Mills, a heavy set man wearing blue jeans and a green shirt, as well as three or four other individuals, standing around a black pick-up truck. After a back-up unit arrived, the officers frisked Mills and the others to determine whether they had a gun. The officers also searched the back of the pick-up truck. No gun was found on the persons searched, or in the black pick-up truck.

Officer Frank Grosso, one of the officers on the scene, recalled that at about 7 p.m., while Mills was still being detained but was not under arrest, the anonymous informant made a second call, reporting that "the officers had the right people, but the gun was no longer [in the pick-up truck], but it was in a white Mustang, next to the pick-up truck." Officer Jonathan Andrews of the Metropolitan Police Department, one of the officers at the scene, "asked [Mills] whether or not it was his car, he stated no." He made the same inquiry of the others who were standing around, but "[n]obody else answered up."[3]

The officers discovered that the doors of the Mustang were unlocked. Officer Andrews and another police officer opened the doors of the car and found police paraphernalia inside, including a "big white sign" saying "official police business." They suspected that the car might belong to a police officer. Mills later told Detective Busch that he had been a reserve police officer in the Fourth or Fifth District.[4] The officers found a yellow bag containing a gun. According to Officer Andrews, "the back seat was folded down . . . [with the bag] sitting on the folded down section of the back seat, directly behind the driver's side." Officer Andrews "[felt] the contour of the gun." Inside the yellow bag was a nine millimeter Glock semi-automatic hand gun, a badge, holster and handcuffs. Mills then admitted knowing something about the white Mustang.[5] As a result, he was placed under arrest, and Detective Gale Busch asked if Mills "wanted to give his side of the story." Mills stated, "yes but you'd better advise me of my rights."

An officer read Mills his Miranda warnings. Detective Busch asked whether Mills understood his rights, and Mills responded in the affirmative. Mills waived his rights, but did not immediately sign a "PD–47" waiver card because he was handcuffed. Detective Busch asked Mills about the gun. Mills told Detective Busch that "he had just purchased the gun out in Maryland and that the papers were inside the vehicle along the side door panel." Officer Andrews found a purchase receipt for the nine millimeter gun "on the

2. Officer Levenberry's testimony, given during the suppression hearing, was stricken as a sanction because of the government's Jencks Act violation. *See Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957) (entitling the defendant in a criminal case to obtain the prior statements of government witnesses who will testify at trial).

3. During the suppression hearing, Officer Grosso was asked whether anyone consented to the search of the white Mustang. He responded, "[n]ot to my knowledge. I wasn't searching the car." He was also asked whether any of the officers on the scene "inquire[d] as to whose car it was." He replied, "I didn't hear anyone in-

quire. . . . No." When Detective Gale Busch arrived at the liquor store parking lot, the other officers had already commenced "their initial investigation." The detective recalls Mills only saying, "[Y]ou can search the truck all you want."

4. Mills had been a reserve officer at one time, but was not at the time of his arrest.

5. Detective Busch testified that when he asked Mills about the white Mustang, he stated that it "belong[ed] to a relative, or that he was just using it."

driver's side in a little compartment of the Mustang."

Mills filed a motion to suppress statements made by him to the police, as well as the physical evidence seized from the white Mustang. He relied on the Fourth and Fifth Amendments to the Constitution of the United States in arguing that the information given by the anonymous caller did not establish reasonable, articulable suspicion or probable cause that he had committed any crime, and that the police had neither his consent, nor a warrant, nor probable cause to search the Mustang. He contended that his statements and the evidence seized constituted the fruits of his illegal detention.

Initially, the trial court denied the motion to suppress on the ground that: (1) the anonymous caller obviously was in a position to observe Mills' actions, including the placement of the gun in the white Mustang; (2) Mills failed to respond when he was asked about the white Mustang and hence had no reasonable expectation of privacy; (3) Mills was advised of his Miranda rights, understood them, and waived them; and (4) the police officers properly searched the car in keeping with their caretaking function.[6] Following the denial of his motion to suppress, Mills entered a conditional plea of guilty, preserving his right to challenge the trial court's denial of his motion. He filed a timely appeal in this court.

After oral argument on appeal, we remanded the record to the trial court on May 19, 1997, for additional factual findings relevant to the disposition of the case. On June 19, the trial court made additional findings.

The trial court "explicitly f[ound] that [Officer Andrews] was a credible witness."[7] In addition, the trial court found

that Mr. Mills did respond negatively when Officer Andrews asked 'whether or not it was his car.' While the question was in terms of 'ownership,' in the fast-moving context of police action, ... the query was broad enough to include any interest in the car, i.e. whether owner, lessee, renter or borrower. When Mr. Mills responded 'no' and the other 3 or 4 people in the immediate area did not respond to the inquiry, this Court concludes that it was objectively reasonable for the police officers to act as they did, to open the unlocked car door and look into the car, especially in view of the police insignia and markings on the car visible from the exterior. Based on the search and seizure concept of abandonment and with reference to the expectation of privacy, this Court concludes that Mr. Mills' actions constituted an abandonment of any possessory interest in the white Mustang for purposes of police examination, inspection and search of the car's interior.

If such a sequence of events as occurred in this case ... does not constitute abandonment, this Court would conclude, alternatively, that the police conduct was reasonable under the Fourth Amendment as coming within the community caretaking function of protecting public safety under the rationale of *Cady v. Dombrowski*, 413 U.S. 433, 441, 447 [93 S.Ct. 2523, 2528, 2531, 37 L.Ed.2d 706] (1973).

The car also [had] an unlocked door. That under those circumstances and under the rationale of [*Cady v. Dombrowski*, 413 U.S. 433, 441, 447, 93 S.Ct. 2523, 2527, 37 L.Ed.2d 706 (1973)], the Court finds that the police acted reasonably in a community care taking function to make sure a gun would not fall in the hands of someone else and none of these people had any interest in this particular white Mustang.

6. The trial court stated in part,

I think the record is sufficiently clear to infer that the concerned citizen, while anonymous, was in a viewpoint where he or she could have seen, observed the scene as it evolved, called the dispatcher and then the dispatcher relayed the information on the scene, not that the concerned citizen was wrong initially, but that as the situation evolved, a person with the gun, instead of putting it in the truck or truck bed, attempted to secret it in the white Mustang parked adjacent thereto.

The trial court also concluded, "Your client up front took the initiative to indicate he understood his rights and there is no controverted testimony that he wasn't duly advised...." Furthermore, the trial court said,

7. After again listening to the testimony of Officer Grosso, the trial court found "that there is sufficient consistency between the testimony of [Officer Andrews and Officer Grosso] to accept as fully credible the testimony of Officer Jonathan K. Andrews."

We determine, first, whether the initial stop of Mills was reasonable under the circumstances, and second, whether Mills has standing to challenge the search of the Mustang and seizure of the gun.

## ANALYSIS

### THE TERRY STOP

■ Mills argues that the police did not have a reasonable, articulable suspicion to believe that he was engaged in criminal activity, and therefore, his initial detention was unlawful. He maintains that the information provided by the anonymous informant was unreliable. The government asserts that the informant's tip provided a valid basis for an investigative detention.

"A police officer must have a reasonable, articulable suspicion that criminal activity is afoot before that officer lawfully can stop (or seize) an individual without that person's consent." *Speight v. United States*, 671 A.2d 442, 446 (D.C.1996) (referencing *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968)). We conclude that based on the first and second informant's tips, the police had reasonable, articulable suspicion sufficient to stop Mills.

The first anonymous tip advised that a man weighing about 300 pounds and wearing blue jeans and a green shirt had a gun and was standing by a black pick-up truck in the parking lot of the Normandy liquor store. When police officers arrived at the scene they saw Mills who clearly fit the physical description given, and who was standing by a black pick-up truck with three or four other people. The second call, coming within minutes of the first, specified that the officers had "the right people," but that the gun was in the white Mustang, which was located right next to the pick-up truck.

In *Speight, supra,* we said:

the [anonymous] report that an individual was armed—potentially implicating the safety of both police officers and the public—combined with the officers' corroboration of an extremely detailed description minutes after hearing the radio broadcast, justified the intrusion involved in briefly detaining and frisking appellants.

*Id.* at 448. Here, the anonymous caller advised that Mills had a gun and provided a clear physical description of him—a man weighing about 300 pounds, wearing a green shirt and blue jeans, and standing next to a pick-up truck with three or four other people. Mills fit the exact physical description given, and was positioned exactly as described by the informant. Moreover, as the trial court found, the informant was a person who clearly was an eyewitness, as evidenced by the first call describing Mills and his location in the parking lot of the liquor store, and by the second call advising that the police had "the right people", but that the gun was in the white Mustang right next to the pick-up truck.

■ The police may rely on an anonymous tip if it "details present circumstances." *Id.* at 447 (quoting *United States v. Gibson*, 64 F.3d 617, 623 (11th Cir.1995)). As the Supreme Court said in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983),

even if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case.

*Id.* at 234, 103 S.Ct. at 2329. Accordingly, we conclude that the anonymous informant's detailed and accurate physical description of Mills, his specification of the exact location of the pick-up truck and the white Mustang, and his obvious personal observation of unfolding events at the liquor store parking lot site, provided the police officers with reasonable, articulable suspicion that criminal activity was afoot and, thus, a reliable and reasonable basis for stopping Mills momentarily not only to conduct a protective search for the gun, but also to engage in reasonable additional investigation.

We turn now to the standing issue.

## I. STANDING

Mills contends that he has standing to challenge the search of the car. He asserts

the status of an authorized borrower who has a reasonable expectation of privacy. He also contends that he "was entitled not to incriminate himself by volunteering his connection to the incriminating evidence in the car." In response, the government argues that Mills lacked standing to challenge the search of the car because he abandoned his interest in the car, and hence lost any expectation of privacy in the car, by saying "no" when asked whether the car was his. The government rejects any notion that Mills has standing as a "borrower," because his status as a borrower was not revealed until after the search of the car had been completed.

To demonstrate standing to challenge the lawfulness of the search and seizure, Mills must show that he had a reasonable expectation of privacy with respect to the white Mustang. In *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the petitioners "asserted neither a property nor a possessory interest in the automobile [at issue], nor an interest in the property seized." *Id.* at 148, 99 S.Ct. at 433. The Supreme Court concluded that they had no standing to challenge a search and seizure [of rifle shells and a sawed-off rifle] "since they made no showing that they had any legitimate expectation of privacy in the glove compartment [where the rifle shells were found] or area under the seat of the car [where the police located the sawed-off rifle]." *Id.* In *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), the Supreme Court made it clear that "ownership [of the items seized] is undoubtedly one fact to be considered ..." but that the key question is "whether governmental officials violated any legitimate expectation of privacy" in the item searched and seized at the time of the search. *Id.* at 105–06, 100 S.Ct. at 2561–62. As we reiterated in *Shreeves v. United States*, 395 A.2d 774 (D.C.1978),

> [t]he issue is not abandonment in the strict property sense, but whether the person

prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search....

*Id.* at 784 (citations omitted). "[A] finding of abandonment is reviewed under a clearly erroneous standard." *Spriggs v. United States*, 618 A.2d 701, 703 (D.C.1992) (citation omitted).

We agree with the trial court that Mills failed to make the requisite showing of a legitimate expectation of privacy in the white Mustang. The trial court's finding that Mills abandoned any expectation of privacy as well as any possessory interest he may have had in the white Mustang is supported by the record.

"[A] legitimate expectation of privacy turns on consideration of all of the surrounding circumstances, including but not limited to defendant's possessory interest." *People v. Ramirez–Portoreal*, 88 N.Y.2d 99, 643 N.Y.S.2d 502, 508, 666 N.E.2d 207, 213 (1996) (citations omitted). However, "[s]tanding to challenge a search is not established by asserting a possessory interest in the goods seized—defendant must assert a privacy interest in the place or item searched." *Id.* 643 N.Y.S.2d at 507, 666 N.E.2d at 212. Hence, whether Mills borrowed the white Mustang from a relative is not dispositive.[8] Rather, the key inquiry is whether Mills "manifested an expectation of privacy that society recognizes as reasonable." *Id.* In that regard,

> the test [to determine whether society recognizes an expectation of privacy as reasonable] has two components. The first is a subjective component—did defendant exhibit an expectation of privacy in the place or item searched, that is, did he seek to preserve something as private ... The

---

8. Mills' status as a borrower was never clearly established in the trial court, and there is no factual finding that Mills borrowed the white Mustang from a relative. Although there is some indication in the record on appeal, based on the testimony of a police detective, that Mills may have borrowed the white Mustang from a relative, or may have been using the car, his suppression motion did not identify any relative as the owner of the car, or explain how he came to use the car. Moreover, at the time of the search, Mills did not claim status as a borrower of the automobile. Only after the car had been searched and the gun had been found did Mills assert any interest in the car.

second component is objective—does society generally recognize defendant's expectation of privacy as reasonable, that is, is his expectation of privacy justifiable under the circumstances....

*Id.* (citations omitted). *See also United States v. Hastamorir,* 881 F.2d 1551, 1559–60 (11th Cir.1989). Furthermore, "[d]efendant's intention to relinquish an expectation of privacy will be found if the circumstances reveal a purposeful divestment of possession of the item searched...." *Ramirez–Portoreal, supra,* 643 N.Y.S.2d at 508, 666 N.E.2d at 213.

In *United States v. Mangum,* 321 U.S.App. D.C. 348, 100 F.3d 164 (1996), the court determined that "[b]ecause Mangum disclaimed ownership of [a knapsack removed from a car], he 'abandoned' his property and waived any legitimate privacy interest in it" saying:

> Courts have long held that, when a person voluntarily denies ownership of property in response to a police officer's question, "he forfeits any reasonable expectation of privacy in [the property]; consequently, police may search it without a warrant."

*Id.* 100 F.3d at 170 (quoting *United States v. Lewis,* 921 F.2d 1294, 1302 (D.C.Cir.1990)). Here, the trial court explicitly found that Mills "did respond negatively when Officer Andrews asked 'whether or not [the white Mustang] was his car.'" Accordingly, the trial court's finding that Mills relinquished any expectation of privacy in the white Mustang when he responded "no" to Officer Andrews' inquiry, and thus abandoned any possessory interest in the car, is not clearly erroneous.

 Mills contends that he "was entitled not to incriminate himself by volunteering his connection to the incriminating evidence in the car." However, nothing in the record before us manifests any intention on Mills' part to assert his privilege against self-incrimination when the white Mustang was about to be searched, and he did not press his contention in the trial court. Moreover, even assuming that Mills intended to invoke his privilege against self-incrimination before

the white Mustang was searched, he waived his privilege when he acknowledged ownership of the gun.

We conclude, then, that because Mills lacks standing to challenge the search of the white Mustang, he cannot challenge the admission of the gun seized from the car during the search nor the statements made after the search.[9]

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*Affirmed.*

---

**9.** Because of our conclusion, we do not need to determine whether the search of the white Mustang was reasonable or based on probable cause.