UNITED STATES, Appellant,

v.

**Donte SCOTT, Appellee.**

**No. 07–CO–871.**

District of Columbia Court of Appeals.

Argued Jan. 29, 2008.

Decided Jan. 28, 2010.

---

Jeffrey A. Taylor, United States Attorney at the time, with whom Roy W. McLeese III, Elizabeth Trosman, and Michael Humphreys, Assistant United States Attorneys, were on the brief, for appellant.

O. Dean Sanderford, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellee.

Before GLICKMAN and FISHER, Associate Judges, and FARRELL, Senior Judge.*

GLICKMAN, Associate Judge:

The United States appeals from the suppression of evidence in its prosecution of Donte Scott for simple possession of mari-

juana and possession with intent to distribute cocaine. The police recovered the marijuana and the cocaine in separate searches after they arrested Scott for selling drugs in plain view of an undercover police officer. The government claims that the trial court erred in ruling that each seizure violated Scott's rights under the Fourth Amendment. We agree with the government as to the cocaine, but not as to the marijuana.

The marijuana was discovered first, in a car parked near the site of Scott's drug transaction. Police searched the vehicle, without a warrant, after finding the keys to it in Scott's possession and learning that he had been using the car with its owner's permission. Although we do not adopt the trial court's stated rationale, we uphold its conclusion that the search of the car violated Scott's Fourth Amendment rights. Contrary to the government's contentions, the record cannot support a finding that Scott relinquished his legitimate expectation of privacy in the vehicle by disclaiming ownership of it; and the evidence of record supports the trial court's implicit determination that the police lacked probable cause to search the car.

██ The cocaine was found after Scott was transported to the police station. There the police required Scott to submit to a full strip search, which culminated in the discovery of a packet of cocaine on Scott's buttock. The trial court ruled that the strip search and ensuing seizure of the packet violated Scott's Fourth Amendment rights. We disagree. Despite its intrusiveness, a strip search for contraband (or a weapon) is permissible as part of a search incident to a lawful arrest if the search is supported by reasonable suspicion and conducted in a reasonable manner. Those conditions were met in this

---

* Judge Farrell was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on January 23, 2009.

case. And where, as here, a lawful strip search reveals evidence that can be removed from the outer surface of the arrestee's body without posing any threat to the arrestee's health or safety, the Fourth Amendment permits the police to seize that evidence immediately, without interrupting the search procedure to obtain a warrant.

## I. Factual Background

The facts relevant to Scott's arrest and the ensuing searches of his car and person were elicited at a pretrial evidentiary hearing on his suppression motion. The sole witness at that hearing was Officer Robert Schagnon of the Metropolitan Police Department (MPD). We understand the trial court to have credited Officer Schagnon's testimony in full. For purposes of this appeal, Scott does not dispute Schagnon's account of the events leading up to and following his arrest.

### A. The Arrest

Scott was arrested in an MPD narcotics enforcement operation carried out under the joint supervision of Officer Schagnon and Lieutenant Murphy[1] on the evening of March 15, 2007. In the course of that operation, Schagnon testified, an undercover police officer observed Scott speak with an unidentified woman outside a convenience store in the 4000 block of South Capitol Street in Southwest Washington, D.C. Scott and the woman then entered the store together, and the undercover officer followed them inside. At the rear of the store, according to Schagnon, the undercover officer observed Scott reach

behind his back "into the waistband of his pants" and pull out a single ziplock bag containing "a white rock substance," which he handed to the woman in exchange for cash. Not having observed this transaction himself, Schagnon was unable to say how far down into his pants Scott reached to retrieve the ziplock bag or how long Scott's hand remained in the back of his pants.

The undercover officer left the convenience store to report what he had seen. Moments later, a team of uniformed officers entered the store and detained Scott there. (The police did not stop the woman who had been with Scott.) The officers conducted a "field search" of Scott's person and found $313 in cash and the keys to a Lexus automobile, but no drugs. Although Officer Schagnon did not observe the field search, he testified at the suppression hearing that the officers would have patted Scott down and looked inside his pockets but would not have put their hands inside the back of his pants, because "[w]e don't do half strip searches on the scene.... [W]e do not pull down pants on the scene or reach on the scene into private areas."[2]

### B. The Search of the Lexus

In addition to finding the Lexus car keys in Scott's possession, the police noticed a Lexus parked approximately thirty feet from the convenience store in an adjacent parking lot. Officer Schagnon testified at the suppression hearing that "Scott initially said he didn't have a car there and then later retracted it and said that the Lexus that was parked outside wasn't his

---

**1.** The record does not disclose Lieutenant Murphy's first name.

**2.** Schagnon's testimony was consistent with the definition of a "field search" in the MPD General Order setting forth guidelines for searches of arrestees: "the removal of coats, jackets or outer clothing to facilitate the

search of these garments and those clothes the prisoner is wearing such as patting down the prisoner and reaching into and squeezing their pockets and items within their possession such as handbags, pocket books, book bags, etc." MPD General Order 502.01, "Transportation of Prisoners" (January 12, 2001).

car," but rather belonged to his cousin, Stephan White, who was working at a pizza restaurant four doors down from the convenience store in the same block. In his suppression hearing testimony, Schagnon did not state what the police asked Scott to elicit his initial statement that he "didn't have a car there." Schagnon added, though, that Scott "volunteered" the information that his cousin owned the Lexus.

Upon receiving that information, Schagnon went to the nearby pizza restaurant and met with White. White confirmed that he owned the Lexus and told Schagnon he had been allowing his cousin Scott to "use" the automobile "for the past several months." Schagnon did not testify whether White said Scott had exclusive use of the Lexus or was using it that day.

Schagnon obtained White's consent to search the Lexus. The police then entered the vehicle, using one of the keys they had taken from Scott to do so. Above the driver's-side visor, the officers found mail addressed to Scott. On the driver's-side floor board they found "a small quantity" of marijuana.

At the suppression hearing, Schagnon agreed that "the only reason" the police searched the Lexus was that they found a key to it in Scott's possession. The police had no "specific information" indicating the presence of a stash of drugs or other contraband in the automobile, and no officer had seen Scott exit the Lexus or have any contact with it. There is no evidence in the record that it was Scott rather than his cousin who had parked the car in the

lot next to the convenience store; nor does the record make clear that Scott knew the vehicle was there before the police questioned him about it.

### C. The Strip Search

After the Lexus was searched, Officer Schagnon and Lieutenant Murphy transported Scott to the MPD's Seventh District station. The two officers believed a strip search of Scott was justified by the undercover officer's observation that Scott had retrieved the ziplock bag containing suspected crack cocaine by reaching into the back of his pants at the waist—an area the "field search didn't allow us to search," Schagnon testified at the suppression hearing. In his experience, Schagnon testified, "it's common for drug dealers to secret[e] drugs ... underneath [their] groin and in their rectum area."

Pursuant to MPD prisoner search guidelines, Schagnon and Murphy requested and received authorization from the District Commander to perform a strip search of Scott, which the two men then conducted in a private and secure area in the police station.[3] The officers directed Scott to remove his clothing one piece at a time. As he did so, the officers visually inspected Scott and the article of clothing for contraband. Eventually, having discovered nothing incriminating, the officers instructed Scott to remove his underwear. At this point Scott stood naked before them. The officers found nothing in his underwear and saw nothing on his body. They then instructed Scott to place his hands on his chest, turn with his back toward them, and

---

**3.** MPD General Order 502.01, *supra* note 2, states that a strip search may be conducted "only" when an officer

has reason to suspect that weapons, contraband or evidence are concealed on the person or in the clothing in such a manner that employing a field search technique may not discover them. Suspicion may be formed on facts surrounding the crime or arrest, on

the basis of information received about [the] prisoner, or as a result of discoveries during the field search. These searches can be conducted only with the authorization of the Assistant District Commander and in a secure area. A sworn member of the same sex as the prisoner shall conduct the search in a private and secure area.

bend forward from the waist. When Scott complied, the officers saw in plain view a clear plastic ziplock bag, 1½ by 2½ inches in size. The officers recognized it to be, in Schagnon's words, "a common bag used for the distribution of cocaine[,] and it was full."

As Schagnon described it at the suppression hearing, the bag was "hanging on the outside of where [Scott's] buttocks come together[,] on the outside of his cheeks." The entire bag was exposed when Scott bent forward; no part of the bag was in his anus. Although the bag was not affixed to Scott's skin by tape, glue or otherwise, it did not immediately drop from his body. Lieutenant Murphy grabbed it from Scott's buttocks while Scott was still bent forward. At that point the search ended. The officers did not undertake a close visual inspection of Scott's anal cavity, nor did they physically probe him in any way.[4] There is no suggestion that they performed the strip search procedure in an abusive or disrespectful manner.

The bag seized from Scott contained forty-one smaller ziplocks of cocaine.

### D. The Parties' Arguments and the Trial Court's Rulings

Scott moved to suppress the evidence seized from the Lexus on the grounds that the warrantless search of the vehicle was neither valid as a search incident to his arrest nor supported by probable cause. In its rejoinder, the government argued only that the officers had probable cause for the search. At the suppression hearing, following Officer Schagnon's testimony, the government additionally contended

that the search of the car was authorized by the consent of its owner, and that Scott lacked "standing" to challenge the search because, as the prosecutor characterized it, he told the police, "It's not my car." Scott disputed the latter newly-raised contentions in a supplemental, post-hearing memorandum.

With respect to the cocaine seized from his person, Scott argued that the police had violated his Fourth Amendment rights by subjecting him to a highly intrusive and humiliating anal cavity search without having what the Supreme Court in *Schmerber v. California*[5] called a "clear indication" (amounting to probable cause) that it would reveal the desired evidence. The government countered that the strip search was lawful as part of the search incident to Scott's arrest because the police had a "reasonable suspicion," based on the undercover officer's observations, that they would find contraband secreted in Scott's clothing or on his person.

After taking the parties' arguments under advisement, the trial court granted Scott's suppression motion with respect to both searches. Announcing its rulings orally from the bench, the court preliminarily found that the police had probable cause to arrest Scott for drug distribution and that the field search of Scott in the convenience store was a lawful search incident to his arrest. Thus, the court upheld the seizure of the money and car keys found on Scott's person at that time.

Turning next to the search of the Lexus, the court concluded that Scott had "standing" to object to the search "even though" he told the police the car belonged to his cousin. Under the Supreme Court's 1960

---

4. MPD General Order 502.01, *supra* note 2, specifically forbids police officers from performing a physical search of a prisoner's genital or anal cavity. When probable cause exists to believe a prisoner has weapons, contraband or evidence secreted in such a body

cavity, the search must be conducted by a physician in a secure and private hospital setting.

5. 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

decision in *Jones v. United States*, [6] the court explained, Scott had standing to challenge the search because it was "directed against" him. Further, the court concluded, the search of the Lexus exceeded the bounds of a permissible search incident to Scott's arrest, inasmuch as the automobile was outside the area of Scott's immediate control when the police undertook to search it. Consequently, the court ruled, the vehicle search violated the Fourth Amendment and its fruits had to be suppressed. In rendering its decision, the court did not mention the government's contentions that the warrantless search of the Lexus was justified by its owner's consent or by the existence of probable cause to believe the car contained contraband. The prosecutor did not request findings of fact or a specific ruling on those issues.

Lastly, the court ruled that the strip search violated Scott's Fourth Amendment rights because the "level of suspicion" required to justify such a search was absent: Officer Schagnon's testimony that the undercover officer saw Scott pull a ziplock "from his waistband" was "too vague," in the court's view, "to support a finding of a clear indication that evidence would be found were a strip search to be conducted." In addition, the court implied, though it did not specifically hold, that Lieutenant Murphy's retrieval of the packet of cocaine from Scott's buttock amounted to a body cavity intrusion for which, in the absence of exigent circumstances, a search warrant was required.

6. 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

7. *Flores v. United States*, 769 A.2d 126, 129 (D.C.2000) (internal quotation marks and citation omitted).

8. *Womack v. United States*, 673 A.2d 603, 607 (D.C.1996).

## II. Fourth Amendment Analysis

 In reviewing a trial court's decision on a motion to suppress, we follow certain well-established principles. "We view the evidence in the light most favorable to the prevailing party, and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court ruling." [7] We defer to the trial court's factual findings unless they are clearly erroneous,[8] and if no "express findings" have been made on a material factual issue, we must affirm if the ruling on appeal "is supportable under any reasonable view of the evidence." [9] We accord no such deference, however, to the trial court's legal conclusions. Appellate review of questions of law, including the necessity for and the existence of probable cause or reasonable suspicion to perform a search under a given set of facts, is *de novo*.[10]

### A. The Automobile Search

 The government argues that the warrantless search of the Lexus did not violate Scott's Fourth Amendment rights for two reasons. First, it argues, Scott abandoned the Lexus by disclaiming ownership when the police asked him about it, thereby forfeiting any reasonable expectation of privacy he otherwise had in the car. Second, the government argues, even if Scott did not relinquish his Fourth Amendment rights, the police had probable cause to search the Lexus. We address and reject each of these arguments in turn.[11]

9. *Peay v. United States*, 597 A.2d 1318, 1320 (D.C.1991) (internal quotation marks and citation omitted).

10. *Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *Womack*, 673 A.2d at 607.

11. We do not reach the merits of two other arguments the government might have made

### 1. Abandonment

 Relying on *Jones v. United States*, the trial court held that Scott had standing to challenge the search of the Lexus simply because it was "directed against" him.[12] In employing this rationale, the trial court erred. The Supreme Court explicitly overruled the so-called "automatic standing" rule of *Jones* in *United States v. Salvucci*,[13] holding instead that a defendant's standing to challenge an unlawful search depends on whether the defendant's *own* Fourth Amendment rights were violated—in other words, on whether the search infringed an expectation of privacy on the defendant's part that "society accepts as objectively reasonable." [14]

Although Scott was not the owner of the Lexus, he presumably had a reasonable expectation of privacy in it at the time of his arrest because he had been borrowing and had the use of the car with its owner's express permission.[15] The government does not contend otherwise. The issue in this case, on which the trial court did not rule specifically, is whether Scott forfeited his expectation of privacy by disclaiming any connection with the vehicle following his arrest.

---

but has chosen, explicitly, to waive on appeal. The government has declined to argue that the search of the Lexus was justified solely by the third-party consent of the owner of the car. Generally speaking, a warrantless search of property in which the defendant has a reasonable expectation of privacy is lawful if the police have obtained permission to conduct the search from a third party who possesses common or superior access to and control over the property, *United States v. Matlock*, 415 U.S. 164, 171 & n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), at least unless the defendant "is present at the scene and expressly refuses to consent." *Georgia v. Randolph*, 547 U.S. 103, 106, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006). This principle has been applied in the bailor-bailee context. *See, e.g., United States v. Jensen*, 169 F.3d 1044, 1049 (7th Cir.1999) (upholding search of car borrowed by defendant because police had obtained the owner's consent); *Hardy v. Commonwealth*, 17 Va.App. 677, 440 S.E.2d 434, 437 (1994) (same; "[w]hile a bailee may have an expectation of privacy in the borrowed vehicle, that privacy interest is subordinate to the owner's right to his vehicle and right to reclaim possession of the vehicle at any time").

The government also has opted not to rely on the search-incident-to-arrest exception to the warrant requirement to defend the search of the Lexus. *See Arizona v. Gant*, —— U.S. ——, ——————, 129 S.Ct. 1710, 1723–24, 173 L.Ed.2d 485 (2009) ("Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest."); *see also* 3 Wayne R. LaFave, Search and Seizure § 7.1(d) at 111 (4th ed. Supp. 2009–10) (noting, *inter alia*, that *Gant's* novel "reasonable to believe" standard, while ambiguous, "[m]ost certainly ... is *not* " equivalent to probable cause).

**12.** *See Jones v. United States*, 362 U.S. 257, 261, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) ("In order to qualify as a 'person aggrieved by an unlawful search and seizure' one must have been a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else.").

**13.** 448 U.S. 83, 84–85, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980).

**14.** *California v. Greenwood*, 486 U.S. 35, 39, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988).

**15.** *See, e.g., United States v. Rubio–Rivera*, 917 F.2d 1271, 1275 (10th Cir.1990) ("Where the defendant offers sufficient evidence indicating that he has permission of the owner to use the vehicle, the defendant plainly has a reasonable expectation of privacy in the vehicle and standing to challenge the search of the vehicle.") (citing cases); *accord Campos v. State*, 885 N.E.2d 590, 598–99 (Ind.2008) (same; citing cases); *United States v. Baker*, 221 F.3d 438, 442–43 (3d Cir.2000) (same; citing cases).

The record of the suppression hearing cannot support such a conclusion. (Hence we do not remand for the trial court to make factual findings relevant to the issue.) It is true enough that a person may relinquish his legitimate expectation of privacy by "abandoning" his interest in it. "The issue is not abandonment in the strict property-right sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search." [16] A voluntary disclaimer of ownership of property in response to a police officer's question often will be enough to demonstrate such abandonment and permit the police to rely on the disclaimer to search the property without a warrant.[17] However, "it should not be assumed … that a disclaimer of ownership *always* constitutes an abandonment for Fourth Amendment purposes." [18] Where the police are on notice that a person has a reasonable expectation of privacy in property based on something other than ownership, it may be unreasonable for them to construe a mere denial of ownership as an abandonment of that expectation.[19] That is so in this case.

"Initially," according to Officer Schagnon, Scott denied having a car in the vicinity of the convenience store where he was arrested. Were that all, Scott might have forfeited his expectation of privacy in the Lexus (though as discussed below, we could say so with more assurance if we knew what the police asked Scott to elicit his denial). But that was not all. As Schagnon testified, Scott "retracted" his disclaimer and stated that the Lexus outside the convenience store belonged to his cousin. Schagnon's use of the word "retracted" (which neither party asked him to clarify) implies that Scott acknowledged he *did* have some access to the Lexus, though he was not its owner. Schagnon did not testify that Scott continued to deny having anything to do with the car. As Schagnon further testified, the owner of the Lexus then confirmed that he had permitted Scott to use the car. The police also found the car keys in Scott's pocket when they arrested him. Consequently, when the police undertook to search the Lexus, they knew Scott was an authorized borrower who, so far as appears, had not disavowed his legitimate expectation of privacy in the automobile merely by his (truthful) denial of ownership. Without further inquiry that would have called into question Scott's possessory interest, the police were not entitled to conclude that he had abandoned

16. *United States v. Boswell*, 347 A.2d 270, 274 (D.C.1975) (quoting *United States v. Colbert*, 474 F.2d 174, 176 (5th Cir.1973)).

17. *See, e.g., Mills v. United States*, 708 A.2d 1003, 1008 (D.C.1997) (citing *United States v. Mangum*, 321 U.S.App. D.C. 348, 354, 100 F.3d 164, 170 (1996), and *United States v. Lewis*, 287 U.S.App. D.C. 306, 314, 921 F.2d 1294, 1302 (1990)).

18. 1 Wayne R. LaFave, Search and Seizure § 2.6(b), at 687–88 (4th ed.2004) (citing cases) (italics added). In *Mills*, where the defendant responded negatively when the officer inquired whether a particular car "was his car," we were careful to note the trial

court's finding that, in context, "the query was broad enough to include any interest in the car, i.e. whether owner, lessee, renter or borrower." 708 A.2d at 1005.

19. For example, in *People v. Cameron*, 73 Misc.2d 790, 342 N.Y.S.2d 773 (N.Y.Sup.Ct. 1973), the court found no abandonment where the defendants merely denied ownership of a bag the police found lying on the floor of their car. "There is a great deal of difference," the court explained, "between denial of ownership of property on a public street where no possession is claimed or indicated and denial of ownership of property in a car where possession is conceded, although ownership denied." *Id.* at 782.

his reasonable expectation of privacy in the Lexus. As a result, we hold, Scott has standing to challenge the search of the vehicle.

### 2. Probable Cause

■■■■ "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment ... permits police to search the vehicle without more."[20] The mobility of the Lexus is not in question. The issue is whether probable cause existed to believe the car contained drugs when the police never saw Scott involve the vehicle in his illicit activity.

■■■■ Probable cause to search a particular place exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found" there.[21] Although "only the probability, and not a prima facie showing, of [the presence of contraband or evidence] is the standard,"[22] something more than a reasonable suspicion is required. "Perhaps the best that can be said generally about the required knowledge component of probable cause for a law enforcement officer's evidence search is that it raise a 'fair probability,' or a 'substantial chance,' of discovering evidence of criminal activity."[23] The test is

an objective one: whether the "historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause."[24]

■■■■ There is no dispute that the undercover officer's observation of Scott's hand-to-hand exchange of a ziplock bag containing a white, rock-like substance for cash furnished all the probable cause necessary for the police to arrest Scott for drug trafficking and to search him for drugs.[25] The government argues that probable cause existed to extend the search to the nearby Lexus because Scott's allegedly "untruthful efforts to dissociate himself from the car,"[26] after the police found the keys to it and $313 in cash but no drugs on his person, raised a fair probability that Scott had contraband inside the vehicle.

The validity of this argument turns on its premise that an objectively reasonable police officer in Officer Schagnon's position would have perceived Scott's initial statement that he "didn't have a car there" as a disingenuous denial of both ownership and possession of the Lexus.[27] The premise is faulty, however, given our standard of review. Viewing the evidence and drawing all reasonable inferences in favor of sustaining the trial court's ruling—i.e., in the light most favorable to Scott, rather than the government—we cannot say that

---

**20.** *Pennsylvania v. Labron,* 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996) (citing *California v. Carney,* 471 U.S. 386, 393, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985)).

**21.** *Ornelas v. United States,* 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

**22.** *Illinois v. Gates,* 462 U.S. 213, 235, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (citation and internal quotation marks omitted).

**23.** *Safford Unified Sch. Dist. No. 1 v. Redding,* —— U.S. ——, ——, 129 S.Ct. 2633, 2639, 174 L.Ed.2d 354 (2009) (internal citations omitted).

**24.** *Maryland v. Pringle,* 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003) (internal quotation marks and citation omitted).

**25.** *See, e.g., Coles v. United States,* 682 A.2d 167, 168 (D.C.1996).

**26.** Brief for Appellant at 22.

**27.** Although the issue turns on how the facts would have appeared to an objectively reasonable officer rather than on Officer Schagnon's subjective assessment of Scott's veracity, it is worth noting that Schagnon did not testify that he perceived Scott as dishonestly trying to dissociate himself from the Lexus.

**1192**

Scott's initial statement to the police was, or reasonably was shown to the police to be, untruthful or evasive.

Our unwillingness to accept the essential premise of the government's argument is largely attributable to the significant gaps in Officer Schagnon's testimony. In the first place, we do not know what the police asked Scott to elicit his statement that he "didn't have a car there." As a result, the meaning of Scott's statement, and how a reasonable police officer would have understood it under the circumstances, is materially uncertain. In *Spinner v. United States*,[28] for example, after the police arrested Spinner for selling drugs and found a set of car keys in his possession, the officer who recovered the keys merely "asked [Spinner] if he owned a car."[29] If the police asked Scott the same question, his response meant only that he did not *own* the Lexus. This possible interpretation of Scott's answer is arguably bolstered by the fact that Scott then volunteered that the Lexus belonged to his cousin, Stephan White. If that is all Scott was saying, the police had no basis to think he was lying to dissociate himself from the vehicle. On the contrary, Officer Schagnon confirmed that White was the car's owner.

 Furthermore, even if Scott initially did deny having possession of the Lexus on the day of his arrest, the information the police had before they searched the vehicle did not necessarily contradict that denial or expose it as disingenuous. The denial might have been truthful, for it might have been White who had been using the Lexus that day and had parked it in the lot next to the convenience store. After all, the Lexus did belong to White, and he was at work in the immediate vicinity. White told Officer Schagnon that he had been allowing Scott to use the car, and Scott had the keys to a Lexus in his possession, but those facts alone do not mean Scott was using the Lexus exclusively or on that day.[30] If Schagnon asked White who was driving the Lexus that day, or if White told him Scott was doing so, Schagnon did not report it at the suppression hearing. We may not reverse the trial court's ruling by drawing the factual inference, adverse to Scott, that Schagnon must have learned more from White than he testified he did.

Other than Scott's ambiguous initial disclaimer, there is no evidence in the record showing the requisite "nexus between the [Lexus] and the drug activity."[31] The police did not see Scott leave or enter the vehicle, remove anything from it, or place anything in it.[32] They did not observe any incriminating evidence in plain view through the car window.[33] Nor did they

28. 618 A.2d 176 (D.C.1992).

29. *Id.* at 177. ("Appellant replied that he did not own a car, but he was driving one." *Id.*)

30. That Scott might not have been driving the Lexus on the day he was arrested does not mean he lacked standing to object to the search of the vehicle. As a permitted co-user of the vehicle, Scott had a reasonable expectation of privacy in it even if White was using it that particular day.

31. *United States v. Brown*, 708 A.2d 637, 639 (D.C.1998); *see also* 2 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 3.7(c), at 412 (4th ed.2004) (explaining that to justify a warrant-

less search, the government must establish "a sufficient nexus between (1) criminal activity, and (2) the things to be seized, and (3) the place to be searched").

32. *Cf. Brown*, 708 A.2d at 638–39 (holding that defendant's suspect activity in the trunk and passenger compartment of his car immediately after he engaged in an apparent drug sale established probable cause to search the vehicle for drugs and drug money).

33. *Cf. Spinner*, 618 A.2d at 179 (holding that police had probable cause to search defendant's car after arresting him for distributing drugs when an officer looked through the car

learn from a reliable informant that Scott was using his car to engage in drug distribution activity or find particularly large quantities of drugs in Scott's possession.[34] Moreover, the government did not present expert police testimony in this case to the effect that "drug dealers often 'stash' drugs or proceeds of drug sales in automobiles." [35]

What we have here is that an undercover police officer observed Scott sell a single bag of cocaine after retrieving it from the back of his pants. When the police then searched Scott, they found a few hundred dollars but no more drugs or other incriminating evidence. The police did find that Scott had the keys to a nearby parked car, which his cousin owned and had permitted him to use. But without a finding that Scott falsely distanced himself from the car—an inference the trial court did not draw and was not required to draw on the existing record—there was no evidence linking the car to Scott's illicit activity. Accordingly, on the record created at the suppression hearing, we hold that the police lacked probable cause to search the Lexus, and we will not reverse the trial court's suppression of the fruits of that search.

## B. The Strip Search

It is useful to begin our discussion of the station house search of Scott's person with some definitions. A "strip search," as defined in MPD regulations and as we shall use the term in this opinion, means "having a prisoner remove or arrange his/her clothing to allow a visual inspection of the genitals, buttocks, anus, breasts and undergarments." [36] Under this definition, the performance of a strip search may include a "visual body cavity inspection," which "occurs when a police officer looks at the arrestee's anal or genital cavities, usually by asking the arrestee to bend over; however, the officer does not touch the arrestee's body cavity." [37] Although

---

window and saw a large amount of cash sticking out of a seat pocket).

**34.** *Cf. United States v. Wider,* 293 U.S.App. D.C. 16, 951 F.2d 1283 (1991). In *Wider,* police received reliable information that a certain person "driving a greyish BMW ... was selling drugs in the 300 block of 53rd Street, Northeast...." 293 U.S.App. D.C. at 18, 951 F.2d at 1285. Responding to the scene, police saw the suspect, appellant Wider, abandon a paper sack. Finding crack cocaine in the sack, the officers stopped Wider and found more bags of cocaine on his person. They then proceeded to search Wider's BMW, from which they recovered still more drugs. Upholding the search of the car, the court stated that "[o]nce the officers here became aware that Wider possessed large quantities of crack, packaged for distribution, and that his automobile was parked nearby, there was a 'fair probability' that the vehicle contained additional evidence of drug dealing activity and therefore probable cause to search it." 293 U.S.App. D.C. at 19, 951 F.2d at 1286.

**35.** *Brown,* 708 A.2d at 639; *see also Spinner,* 618 A.2d at 178 (arresting officer recovered

car keys from suspect and "based on his experience he knew that drug sellers in the area often worked with a car"). We do not mean to suggest, however, that by itself such expert testimony would have been enough to tip the balance in this case in favor of finding probable cause to search the Lexus. That question is not before us for resolution and we express no opinion on it.

**36.** MPD General Order 502.01, *supra* note 2. Other courts have adopted similar definitions. *See, e.g., People v. Hall,* 10 N.Y.3d 303, 856 N.Y.S.2d 540, 886 N.E.2d 162, 165 (2008) ("A 'strip search' requires the arrestee to disrobe so that a police officer can visually inspect the person's body."); *State v. Nieves,* 383 Md. 573, 861 A.2d 62, 70 (2004) ("In general, strip searches involve the removal of the arrestee's clothing for inspection of the under clothes and/or body. Some have defined strip searches to include a visual inspection of the genital and anal regions of the body.") (citation omitted).

**37.** *Hall,* 856 N.Y.S.2d 540, 886 N.E.2d at 165.

the Supreme Court has hesitated to "define strip search and its Fourth Amendment consequences in a way that would guarantee litigation about who was looking and how much was seen," [38] we recognize that a visual body cavity inspection exacerbates the intrusiveness of a strip search. In contrast, a so-called "manual body cavity search," involving any "touching or probing of a [genital or anal] body cavity that causes a physical intrusion beyond the body's surface," [39] is outside the scope of what is normally meant (and what we shall mean) by a strip search.[40]

The police are not authorized to strip search everyone they arrest. The parties before us agree that particularized justification must exist for a strip search of an arrestee to be deemed reasonable under the Fourth Amendment.[41] That is where the parties' agreement on this issue ends, however. They disagree not only over the level of justification required for a strip search incident to arrest, but also over

whether the requisite justification existed in this case and whether the police performed the strip search of Scott in a reasonable manner. We address each of those questions in turn.

**1. The Justification Required for a Strip Search of an Arrestee**

Relying primarily on the Supreme Court's decision in *Schmerber*, [42] Scott argues that the police needed to have probable cause to believe he was concealing contraband in the private parts of his body they ordered him to expose; and that in the absence of exigent circumstances, the police were required to obtain a search warrant. The government, distinguishing *Schmerber* and citing the weight of judicial authority since the Supreme Court's 1979 decision in *Wolfish* [43] upholding strip searches of prison inmates on less than probable cause, argues that a strip search incident to a lawful arrest—an arrest itself based on probable cause—need only be justified by reasonable suspicion, a less demanding standard than probable cause.[44]

---

**38.** *Safford Unified Sch. Dist. No. 1 v. Redding,* —— U.S. ——, ——, 129 S.Ct. 2633, 2641, 174 L.Ed.2d 354 (2009).

**39.** *Hall,* 856 N.Y.S.2d 540, 886 N.E.2d at 165.

**40.** To be clear, in this opinion we are not talking about inspections or searches of body cavities such as the mouth or the nose, which do not raise the same unique Fourth Amendment concerns as intrusive examinations of genital or anal cavities.

**41.** "The Fourth Amendment prohibits only unreasonable searches." *Bell v. Wolfish,* 441 U.S. 520, 558, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (citing *Carroll v. United States,* 267 U.S. 132, 147, 45 S.Ct. 280, 69 L.Ed. 543 (1925)).

**42.** *Schmerber v. California,* 384 U.S. 757, 769–70, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (holding that "absent an emergency," police must obtain a warrant supported by probable cause to conduct a search of an arrestee involving even a minimal "intrusion[] beyond

the body's surface," such as the extraction of a blood sample with a needle).

**43.** 441 U.S. at 559–60, 99 S.Ct. 1861.

**44.** As was true in *Wolfish,* routine strip searches of prison inmates for contraband may be justified in large part by institutional security requirements. *See id.* at 559, 99 S.Ct. 1861 (noting that "[a] detention facility is a unique place fraught with serious security dangers"). One court has construed *Wolfish* to imply that "a policy or practice of strip searching all arrestees as part of the process of booking them into the general population of a detention facility, *even without reasonable suspicion to believe that they may be concealing contraband,* is constitutionally permissible." *Powell v. Barrett,* 541 F.3d 1298, 1300 (11th Cir.2008) (en banc) (emphasis added). Whatever the merits of that conclusion (which has not found favor outside the Eleventh Circuit), the government does not rely on prison security concerns to justify the strip search in the present case. The government concedes that reasonable suspicion is required for the

■ We begin our consideration of the parties' contentions with the recognition that, although the Fourth Amendment "generally requires a law enforcement officer to have probable cause for conducting a search" of any nature,[45] searches incident to a lawful custodial arrest are an exception to that rule. In *United States v. Robinson,*[46] the Supreme Court explained that "[t]he authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect."[47] Rather, the Court held, a search incident to an arrest supported by probable cause "requires no additional justification.... [I]n the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment."[48]

■ A "full search" incident to a lawful arrest properly may involve "a relatively extensive exploration of the person" of the arrestee.[49] However, as the Supreme Court has cautioned, that does not mean it automatically may include a strip search.[50] The Fourth Amendment requires that even searches incident to an arrest must be reasonable in scope. In most circumstances, "the reasonableness of a search's scope depends only on whether it is limited to the area that is capable of concealing the object of the search."[51] But strip searches are so exceptionally intrusive that they cannot be defended as a reasonable accompaniment of all custodial arrests regardless of the circumstances. "[B]oth subjective and reasonable societal expectations of personal privacy support the treatment of such a search as categorically distinct, requiring distinct elements of justification ... for going beyond a search of outer clothing and belongings."[52] "In each case," the Fourth Amendment's reasonableness standard "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails."[53] In performing this balancing, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."[54]

As to the scope of the intrusion, courts that have considered strip searches in the

police to conduct a strip search incident to an arrest.

**45.** *Redding,* 129 S.Ct. at 2639.

**46.** 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973).

**47.** *Id.* at 235, 94 S.Ct. 467.

**48.** *Id.*

**49.** *Id.* at 227, 94 S.Ct. 467.

**50.** *See Illinois v. Lafayette,* 462 U.S. 640, 646 n. 2, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983) (noting that the Court had not considered "the circumstances in which a strip search of an arrestee may or may not be appropriate").

**51.** *Redding,* 129 S.Ct. at 2649 (Thomas, J., concurring in the judgment in part and dissenting in part).

**52.** *Id.,* 129 S.Ct. at 2641 (requiring reasonable suspicion to justify the strip search of an adolescent student by school personnel looking for drugs).

**53.** *Wolfish,* 441 U.S. at 559, 99 S.Ct. 1861. Although *Wolfish* involved the question of strip searches of inmates at detention facilities, courts have. understood the balancing test articulated by the Supreme Court to apply across the board and have utilized it to evaluate strip searches in other contexts as well, including searches incident to arrest.

**54.** *Id.*

decades since *Wolfish* have recognized, as do we, that

> strip and [especially] visual body cavity searches impinge seriously upon the values that the Fourth Amendment was meant to protect. These searches require an arrestee not only to strip naked in front of a stranger, but also to expose the most private areas of [his or] her body to others. This is often, as here, done while the person arrested is required to assume degrading or humiliating positions.[55]

We will not cavil with judicial descriptions of strip searches involving visual body cavity inspections of the anus or vagina as "demeaning," "dehumanizing," and offensive to personal dignity.[56]

Along with other courts, though, we also appreciate that the law enforcement need to remove concealed weapons and drugs from arrestees is a powerful countervailing consideration. As Officer Schagnon testified, and numerous cases in this and other jurisdictions attest, it is by no means uncommon for drug dealers (or other offenders) to secrete weapons and drugs in their genital or rectal areas to avoid detection.[57]

Both the benefits of discovering such items in the possession of persons under custodial arrest and the dangers of failing to discover them are obvious and substantial. Furthermore, while we do not minimize the intrusiveness of a strip search, its unpleasantness may be mitigated if it is conducted—as the Fourth Amendment requires—in a reasonable, private and secure setting and in a reasonable, non-abusive manner.[58]

 Balancing the legitimate needs of law enforcement against the privacy interests of persons under lawful arrest, the majority of courts have concluded that a strip search (including a visual body cavity inspection) of an arrestee is permissible under the Fourth Amendment if it is justified by reasonable suspicion that a weapon or contraband may be found in the area inspected.[59] Reasonable suspicion, though "a less demanding standard than probable cause," [60] imposes a requirement of objective justification. It is a standard that will not be met in the case of every custodial arrest,[61] for it requires the police to have "a particularized and objective basis for suspecting" that the search will be productive.[62] "The suspicion must be specific to

---

**55.** *Swain v. Spinney,* 117 F.3d 1, 6 (1st Cir. 1997).

**56.** *Id.* (quoting, *inter alia, Mary Beth G. v. City of Chicago,* 723 F.2d 1263, 1272 (7th Cir. 1983), which recites a veritable litany of invective to describe strip searches).

**57.** In this jurisdiction, *see, e.g., Jefferson v. United States,* 906 A.2d 885, 887 (D.C.2006); *Washington v. United States,* 594 A.2d 1050, 1051 (D.C.1991); *United States v. Rodney,* 294 U.S.App. D.C. 9, 10, 956 F.2d 295, 296 (1992).

**58.** *See Wolfish,* 441 U.S. at 560, 99 S.Ct. 1861 ("The searches must be conducted in a reasonable manner.").

**59.** *See, e.g., Swain,* 117 F.3d at 7; *Hartline v. Gallo,* 546 F.3d 95, 100 (2d Cir.2008); *State v. Nieves,* 383 Md. 573, 861 A.2d 62, 76

(2004); *People v. Hall,* 10 N.Y.3d 303, 856 N.Y.S.2d 540, 886 N.E.2d 162, 166 (2008). *But see Fuller v. M.G. Jewelry,* 950 F.2d 1437, 1449 (9th Cir.1991) (holding that a visual body cavity search requires probable cause and a search warrant); *Commonwealth v. Thomas,* 429 Mass. 403, 708 N.E.2d 669, 673 (1999) (holding probable cause to be required for strip and visual body cavity searches).

**60.** *Illinois v. Wardlow,* 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000).

**61.** For example, numerous courts have found reasonable suspicion lacking for strip searches of persons arrested for non-violent, non-drug offenses. *See Bame v. Dillard,* 647 F.Supp.2d 43, 51 (D.D.C.2009) (citing cases).

**62.** *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

the individual being searched," [63] and the more intensive the bodily examination, the more particularized the suspicion must be.[64] In determining the existence of reasonable suspicion for a strip search incident to an arrest, "the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest" all may have a bearing; [65] and as with probable cause, the police are allowed "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' " [66] But the police "must be able to articulate more than an inchoate and unparticularized suspicion or hunch." [67]

▮▮▮ Considering what is at stake, we agree with the majority of other courts that "reasonable suspicion" is a constitutionally sufficient justification for conducting a warrantless strip search incident to a lawful arrest. The search may include a visual body cavity inspection (but not a physical intrusion) if particularized reasonable suspicion exists to justify that step. We are not persuaded that the police must have probable cause to believe the strip search will yield a weapon or contraband, or that the police must first obtain a warrant to conduct the search in the absence of exigent circumstances. It is true that the Supreme Court adopted a probable cause standard and a warrant requirement in *Schmerber* for searches involving "intrusions into the human body." [68] But as the Court recognized implicitly in *Wolfish* and *Redding*, strip searches "do[ ] not implicate the Court's cases governing bodily intrusions ... because [they do] not involve a 'physical intrusion, penetrating beneath the skin.' " [69] There is a qualitative difference between a purely visual strip search, even one involving a visual body cavity inspection, and a physical intrusion such as a manual body cavity search, that warrants a difference in the level of justification required. As the New York Court of Appeals has explained:

> Unlike manual body cavity searches, strip searches and visual cavity inspections do not create a risk of physical pain or injury to arrestees. Because a manual cavity search is more intrusive and gives rise to heightened privacy and health concerns, when weighed against the legitimate needs of law enforcement, we believe it should be subject to a stricter legal standard.[70]

**63.** *United States v. Barnes*, 506 F.3d 58, 62 (1st Cir.2007) (citation omitted).

**64.** *Id.* ("[A] visual body cavity search involves a greater intrusion into personal privacy [than an ordinary strip search]. Accordingly, prior to conducting a visual body cavity search, we require a more particularized suspicion that contraband is concealed.") (internal citation omitted).

**65.** *Hall*, 856 N.Y.S.2d 540, 886 N.E.2d at 166 (internal quotation marks and citation omitted).

**66.** *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (quoting *Cortez*, 449 U.S. at 418, 101 S.Ct. 690).

**67.** *Wardlow*, 528 U.S. at 123–24, 120 S.Ct. 673 (internal quotation marks and citation omitted).

**68.** *Schmerber v. California*, 384 U.S. 757, 770, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

**69.** *Redding*, 129 S.Ct. at 2649 n. 3 (Thomas, J., concurring in the judgment in part and dissenting in part) (quoting *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 616, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989)). *See also Wolfish*, 441 U.S. at 560, 99 S.Ct. 1861.

**70.** *People v. Hall*, 10 N.Y.3d 303, 856 N.Y.S.2d 540, 886 N.E.2d 162, 166–67 (2008) (holding that a visual body cavity inspection may be conducted based on reasonable suspicion, but if the visual inspection reveals the presence of a suspicious object inside the body cavity, *Schmerber* requires the police to obtain a warrant authorizing the removal of the object unless there are exigent circumstances).

### 2. The Existence of Reasonable Suspicion to Strip Search Scott

 The next question is whether, under the totality of circumstances confronting them, the police had a particularized and objective basis amounting to reasonable suspicion that Scott had drugs hidden under his clothing and in his buttocks or anal area. We hold they did.

An undercover officer saw Scott reach into the back of his pants at the waist to retrieve a ziplock of apparent crack cocaine. Scott emphasizes that it was only a single ziplock and that we have no evidence of how far down into his pants Scott reached or how long he kept his hand there. But that begs some obvious questions: how was Scott carrying the little ziplock he retrieved from the back of his pants, and was that ziplock the only one he had on him? It is implausible to suppose that Scott merely had placed a single small plastic bag loose in his waistband, or under his pants or underwear, because it would have been too easy for such a little bag to slip or fall and become difficult to reach or even lost. It is at least reasonable to suppose that Scott carried the little ziplock *in* something, if only to avoid those dangers.[71] *In what?* Scott did not take the ziplock out of his pocket. The most reasonable surmise would have been that he extracted it from a bigger package of some kind—a package that, by virtue of its larger size and proper positioning, could have stayed hidden between Scott's buttocks, or in some other suitable place under his clothing, without slippage. As Officer Schagnon knew, and as past cases of this and other courts manifest, it is common for drug dealers to carry their wares in just this fashion in their groin or rectal areas. If Scott had been carrying such a package, it was probably still present when the police arrested him, for until then he had no reason and scarcely any time to dispose of it. That the package was not discovered in the superficial field search did not mean it was not there.[72] Furthermore, if Scott was concealing a package that had contained one salable ziplock of cocaine, that package obviously could have been holding ziplocks Scott had not yet managed to sell. The substantial amount of cash found on Scott's person—the possible proceeds of multiple drug sales—lent additional support to the suspicion that he might be carrying more drugs somewhere underneath his pants. Nothing the police knew contradicted that suspicion in Scott's case. We conclude it was a reasonable suspicion for Officer Schagnon and Lieutenant Murphy to pursue via a strip search culminating in a visual body cavity inspection.

### 3. The Reasonable Place and Manner of the Strip Search

 Finally, we are satisfied that the strip search of Scott was performed in a reasonable place and manner. It was conducted, in accordance with official police guidelines, in a secure and private setting by two officers who were of the same gender as Scott. The officers employed a methodical, step-by-step procedure that minimized, as much as possible, the invasion of privacy required to discover the contraband on Scott's person. No undue force was employed; indeed, Scott was allowed to remove all his clothing himself, and the searching officers had almost no physical contact with him. Scott complains about being asked to bend over from the waist and assume a vulnerable and humiliating position, but that was a

---

**71.** Conceivably, Scott might have fastened the little ziplock to his clothing or body by pin, tape or other adhesive, but there is no evidence he did so.

**72.** Had the police found Scott's "stash" during the field search, however, the subsequent strip search might well have lacked justification.

reasonable request to expose the only remaining area in which the suspected drugs might have been (and of course were) secreted. Scott was not put through any bizarre or unnecessary contortions or manipulations. While he presumably exposed his anus when he bent over, the officers immediately terminated the search upon finding the packet of drugs on the outer surface of Scott's buttock and refrained from any additional, gratuitous inspection of his anal cavity. Thus, the search did not extend beyond its justification; it was no more intrusive than necessary. Scott's bodily integrity was not compromised, and he was not mistreated, harassed, or abused.

■ Lieutenant Murphy's seizure of the obviously incriminating packet of drugs from the exposed surface of Scott's buttock was reasonable too. It did not increase the unpleasantness or indignity of the procedure to which Scott was subjected. Inasmuch as Lieutenant Murphy could (and did) retrieve the packet without having to extract it from Scott's anal cavity or endangering Scott's health or safety in any way, we conclude that no warrant was necessary to authorize its seizure.

### III. Conclusion

For the foregoing reasons, we uphold the suppression of the marijuana found in the Lexus, reverse the suppression of the drugs found on Scott's person, and remand the case for trial.